THE STATE OF OHIO, APPELLEE, *v.* MUNDT, APPELLANT.

[Cite as *State v. Mundt,* 115 Ohio St.3d 22, 2007-Ohio-4836.]

(No. 2005–0192—Submitted April 17, 2007—Decided October 3, 2007.)

———————

O'DONNELL, J.

{¶ 1} On March 9, 2004, seven-year-old Brittany Hendrickson disappeared from her home in Noble County. The next day, searchers found Brittany's raped, battered body hidden in a nearby abandoned well. Appellant, Frederick A. Mundt, was convicted of the aggravated murder of Brittany and sentenced to death.

{¶ 2} The evidence at Mundt's trial revealed that Brittany's mother, Misty Hendrickson, became acquainted with Mundt in 1999. She and her daughters, Brittany and Lindsay, soon moved into Mundt's house in Lower Salem, Noble County. In 2004, Mundt and Hendrickson lived there with Brittany and Lindsay, and their infant son, Shay Mundt. Mundt's mother, Sarah Mundt, lived nearby with her boyfriend Tim Bowman and their adult daughters, Mundt's half-sisters, Timica, Teresa, and Mary Anne Bowman.

{¶ 3} During the late morning or early afternoon of March 9, 2004, Mundt visited the Biolife Plasma Services Plasma Center in Parkersburg, West Virginia to sell his blood plasma.

{¶ 4} March 9, 2004, was a school day for Brittany Hendrickson. The school bus brought her home that day around 4:10 p.m., and her bus driver saw her go inside the house.

{¶ 5} Five or ten minutes later, Mundt's stepfather, Tim Bowman, arrived. Bowman and Sarah, along with their daughter Mary Anne and her date, had plans to play bingo that night in Woodsfield, Ohio. Bowman came to invite Hendrickson to join them. After checking with Mundt, Hendrickson accepted. Bowman was at Mundt's house for five to ten minutes; during that time, he saw Brittany and Lindsay at play.

{¶ 6} Hendrickson fed her daughters about 4:45 p.m. Half an hour later, Bowman arrived at Mundt's house to pick Hendrickson up.

{¶ 7} Hendrickson said goodbye and "told the kids to go upstairs with their dad [Mundt] when they [were] done eating." Although Bowman did not enter the house, he recalled hearing Hendrickson telling the girls to eat dinner and go upstairs.

{¶ 8} Around 8:00 p.m., Mundt arrived at the Bowman residence with Lindsay and Shay. Timica and Teresa Bowman were present. Mundt asked Timica if Brittany was there and said, "[S]he ain't up home, and I have to find her." Leaving the children with Teresa, Mundt and Timica drove to Woodsfield.

{¶ 9} They arrived at the bingo hall around 8:30 p.m. Mundt approached Hendrickson and asked if Brittany was with her. Hendrickson replied, "No, I left her there with you." She got up, grabbed her coat, and left with Mundt and Timica. The three then drove back to Mundt's house. At 9:18 p.m., Hendrickson called the Monroe County Sheriff's Office to report Brittany missing. Officers immediately began to search for Brittany, a search that lasted into the next day.

{¶ 10} On March 10, a civilian volunteer taking part in the search noticed a sheet of tin covering the opening of an old well on property near Mundt's house. Moving the tin revealed a chunk of concrete wedged into the opening of the well. The surface of the well water was visible around the sides of the concrete chunk. The volunteer looked into the well and saw a pair of green shoes floating amid some debris. The volunteer reported his find and led sheriff's deputies to the well.

{¶ 11} The deputies recovered one of the shoes and brought it to Hendrickson, who identified it as Brittany's. Other officers removed the chunk of concrete and recovered Brittany's body from the well.

{¶ 12} Shortly after the officers recovered her body, Agents Gary Wilgus and William Hatfield of the Bureau of Criminal Identification and Investigation ("BCI") arrived at the crime scene. Wilgus noted numerous abrasions and contusions on Brittany's head. Her jeans were undone, and the leg bottoms partly covered her feet.

{¶ 13} Hatfield found bloodstains and hairs on the chunk of concrete from the well. Hatfield later weighed and measured the chunk; it was 36 inches long and 14 inches wide at its widest point and weighed 254 pounds.

{¶ 14} According to Hendrickson, Mundt stated on the morning of March 10 that "they will probably pin this on him * * * because he was supposed to be the last one to see her."

{¶ 15} Detective Sergeant Mark Warden and Lieutenant Seevers of the Washington County Sheriff's Office interviewed Mundt after Brittany's body was found. Mundt asked whether a condemned prisoner could "choose between lethal injection and the gas chamber." Warden then informed Mundt that Brittany's body had been found and that Warden "felt he was responsible for [her] death." Mundt denied it.

{¶ 16} Warden noted that Mundt's forearms were scratched. Mundt claimed that the family dog had knocked him down some steps while he was looking for Brittany. When Warden expressed disbelief, Mundt merely hung his head. Biolife Plasma Services personnel later testified that Mundt did not have those scratches on his arm when he sold plasma on the morning of March 9.

{¶ 17} Seevers asked Mundt whether Brittany could have been sexually assaulted. Mundt first said no, then asked, "Well, how would I know?" The officers then took a DNA swab and collected other trace evidence from Mundt's person. As Warden was cataloguing these items, Mundt asked: "Do you think I should die?" Warden replied, "Well, do you think you should be put to death?" Mundt said, "Yes."

{¶ 18} Dr. P.S.S. Sreenivasa Murthy, a pathologist and deputy coroner for Stark and Wayne Counties, conducted an autopsy on Brittany, assisted by Dr. Anthony Bertin, a urologist, who examined Brittany's genitalia.

{¶ 19} Dr. Murthy found that Brittany had extensive blunt-force head injuries. These included multiple lacerations and bruises, a skull fracture, and hemorrhaging and contusions of the brain. She also had blunt-force injuries to her trunk and extremities.

{¶ 20} Brittany's lungs were hyperinflated and contained excess fluid, leading Dr. Murthy to conclude that she had drowned in the well. But because Brittany was 47 inches tall while the water in the well was only 30 to 36 inches deep, Murthy concluded that Brittany's injuries had left her unable to stand up.

Murthy also concluded that given the severity of her injuries, Brittany would have died within 10 to 15 minutes. Thus, Murthy concluded that she died both of drowning and of her multiple blunt-force injuries.

{¶ 21} Dr. Bertin, the urologist, observed that Brittany's panties were soaked with blood. Her vaginal opening was "imploded," as if a large object had been forced into it. Her vaginal walls had been "ripped apart," with deep, full-length lacerations on both sides. In Dr. Bertin's opinion, a rigid object, approximately two and one-half inches in diameter, had been forced up Brittany's vaginal canal with "considerable force."

{¶ 22} Diane Larson, a BCI forensic scientist, examined numerous evidentiary items. Those yielding significant DNA evidence included vaginal swabs taken during Brittany's autopsy, fabric cut from the crotch of Brittany's panties, a bloodstained bedsheet found on the bed in Mundt's master bedroom, and a bloodstained shirt found in Mundt's bathroom and identified as his.

{¶ 23} Larson found sperm cells on the vaginal swabs and on Brittany's panties. She identified a mixture of two DNA profiles on the sperm fraction of the vaginal swabs. One of the mixed profiles was consistent with Mundt; the other was consistent with Brittany. The proportion of the population that could not be excluded as a possible contributor to that mixture was one in 203,800.

{¶ 24} On the panties, Larson identified "two clean separate DNA profiles." The major profile, or largest amount, came from sperm and was consistent with Mundt's DNA. The expected frequency of the major profile was one in approximately 39 quadrillion, 350 trillion persons. The minor profile was consistent with Brittany's DNA.

{¶ 25} On the bedsheet, DNA testing showed a mixture of two DNA profiles. The major profile was consistent with Mundt's DNA; the minor profile was consistent with Brittany's. The expected frequency of the minor profile was one in 146 million persons.

{¶ 26} Mark Losko, another forensic scientist at BCI, testified that testing on Mundt's shirt revealed a mixture of two DNA profiles. The major profile was consistent with Brittany's DNA. The expected frequency of that profile was one in 4.7 quadrillion persons. The minor profile was consistent with Mundt's DNA.

{¶ 27} After Mundt's arrest, his half-brother, Johnny Mundt, visited him in jail. Johnny testified that he asked Mundt "if he done it." Mundt admitted that he had raped Brittany. Then he asked Johnny "if I can get the stuff out of the house." Mundt told Johnny that "the stuff" was behind the stereo. Johnny agreed to remove it.

{¶ 28} On April 24 and 25, 2004, while Mundt was incarcerated in the county jail, he had several telephone conversations with Johnny. In these conversations,

Mundt repeatedly urged Johnny to remove and destroy certain "stuff" or "trash" located in the wall behind the stereo in Mundt's house. The sheriff's office recorded these conversations, and the state introduced them at trial.

{¶ 29} These recordings convey Mundt's sense of urgency and concern for secrecy because he continually expressed his anxiety about when Johnny was going to burn the "trash" and whether he had burned "all of it." He warned Johnny that their conversation was being taped and reminded him several times not to let their mother see him burning the "trash."

{¶ 30} On April 24, Mundt asked Johnny: "Hey, did you get all that stuff out of there where the radio is? * * * Would you be able to get that out?"

{¶ 31} Mundt continued:

{¶ 32} "You going to burn that stuff? * * * Well, make sure Mom ain't down there when you get burning that. * * * I really—really hope you can do that for me."

{¶ 33} "You, uh, sure you can get that stuff out of there? * * * I'm really a-hoping. * * * 'Cause I'm really wanting that stuff out of there. You hear? * * * Make sure you get it all."

{¶ 34} "Yeah, I hope you do that, take—take that trash out. Out—out back of the stereo. I really need to get that out of the house. You hear? * * * Back behind the stereo, yeah. Where the wall's at? * * * Down in there. * * * You going to burn all that? * * * That would do me a lot of good."

{¶ 35} On the following day, Mundt talked to Johnny three more times. In the first of these conversations, Mundt asked: "Did you get all that trash burnt?" Mundt explained that the "trash" was hidden in the wall to the left of the stereo "where the insulation [was] moved," approximately two feet away from the drywall. He instructed Johnny to "find all that trash" and "get rid of that for me and burn it. * * * Don't have Ma and them up there." He also warned Johnny that "[t]his telephone's taped."

{¶ 36} In their second conversation on April 25, Mundt pressed Johnny: "Did you get it? * * * Did you get all of it? * * * Make sure you burn all that trash. * * * Mom and them can't see that."

{¶ 37} In his third April 25 conversation with Johnny, Mundt again asked: "Did you make sure that other trash is burnt?" He told Johnny to "make sure that burns up nice and good. * * * Make sure there ain't nothing left of it. * * * 'Cause they be up there looking through that next." Johnny said, "They're done up there, they ain't gonna go back up there." Mundt replied, "Don't bet on it."

{¶ 38} According to Johnny, he eventually found "a little hole" in the corner of a room in Mundt's house. In that hole, Johnny found a pair of boxer shorts, a T-

shirt, a pair of girl's socks, and a pillowcase, each spattered with blood. Johnny put these items into a box and hid the box in another part of the house. The next day, he took the box home and burned it with the bloodstained items inside.

{¶ 39} On April 26, Mundt talked to Sarah Mundt from jail. The sheriff's office recorded this conversation. Sarah mentioned that Johnny had been burning things the night before, including a box. Mundt had his mother describe the box, then asked: "He burn it?" Mundt pressed Sarah for details: "Did you go up with him last night? * * * Did he pour gas on all that trash? * * * Did it burn?"

{¶ 40} On May 3, 2004, police searched Mundt's house again. In a second-floor room, between a floor joist and the exterior wall, they found the space where Mundt had hidden the bloodstained items.

{¶ 41} Police cut out a section of the floor joist from the hiding place. The joist tested positive for blood. Mark Losko, the BCI forensic scientist, found a mixture of two DNA profiles on the joist. The major contributor's DNA profile was consistent with Brittany's and would be found in one of 4.7 quadrillion persons. The minor contributor's DNA profile was consistent with Mundt's and would be found in one of 139 persons.

{¶ 42} On June 19, Mundt had yet another phone conversation with his mother from jail, and this too was recorded by the sheriff's office. Mundt urged his mother to remove his weights from his house: "You need to get those weights out of there. * * * They'll use that against me. * * * They'll try to say that I lifted those things down there. * * * Well, at least take some of the weights off the weight bench. * * * Did you take any weights off it?"

### Verdict and Sentence

{¶ 43} At trial, the jury found Mundt guilty of four counts of aggravated murder, each with four death specifications; two counts of rape, R.C. 2907.02(A)(1)(b) and (A)(2); and one count of kidnapping.

{¶ 44} Before the penalty phase, the trial court merged the four aggravated-murder counts into a single count of aggravated murder under R.C. 2903.01(C) (murder of a child under 13) and merged the four specifications into two: murder to escape detection, apprehension, trial, or punishment for another offense, R.C. 2929.04(A)(3), and murder committed during a kidnapping, R.C. 2929.04(A)(7).

{¶ 45} The jury recommended that Mundt be sentenced to death for his aggravated-murder conviction. The trial judge sentenced Mundt to death. Mundt appeals his convictions and death sentence to this court as of right.

{¶ 46} Mundt presents 11 propositions of law for our consideration. We find no merit in any of his claims. Furthermore, we have independently reviewed the sentence of death, as R.C. 2929.05 requires, and find that the aggravating

circumstances outweigh the mitigating factors beyond a reasonable doubt. We have also conducted a proportionality review and conclude that the death sentence is proportionate with others we have affirmed. Therefore, we affirm Mundt's convictions and death sentence.

## I.   Ineffective Assistance of Counsel

{¶ 47} In his first proposition of law, Mundt contends that his trial counsel rendered ineffective assistance of counsel during voir dire, the guilt phase, and the penalty phase.

## A.   Ineffective Assistance During Voir Dire

{¶ 48} Mundt makes three ineffective-assistance claims relating to the voir dire. First, Mundt claims that his trial counsel rendered ineffective assistance during the voir dire of juror Julie Watson by not asking her about statements on her juror questionnaire. Second, he claims that his counsel should have challenged juror Connie Gaydosik, either for cause or peremptorily, and also should have asked her about specific mitigating factors. Third, he claims that counsel prejudiced him by asking a hypothetical question on voir dire that, in effect, conceded his guilt.

### 1.   Voir Dire of Julie Watson

{¶ 49} In *Morgan v. Illinois* (1992), 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492, the United States Supreme Court held that a juror who will automatically vote for death without regard to mitigating factors is biased and may not sit in a capital case. Mundt contends that certain responses on Watson's jury questionnaire indicate that Watson may have been such a juror, at least in a case involving the rape and murder of a young child. Mundt therefore contends that defense counsel should have specifically questioned her about those responses on voir dire and that counsel's failure to do so constituted ineffective assistance.

{¶ 50} Mundt focuses on the following questions and answers from Watson's questionnaire:

{¶ 51} "60.   What is your opinion concerning capital punishment?   * * * Please explain your choice."   Given six options ranging from "Strongly favor" to "Strongly oppose," Watson checked "Favor," adding, "When concerning child abuse, mu[r]der[,] rape."

{¶ 52} "61.   If you were told by the Court that you must follow a legal principle which was in conflict with your personal convictions, what would you do?" Watson wrote: "I do things the way I know in my heart I should."

{¶ 53} "63.   What factors do you think are relevant in deciding whether a person should be sentenced to the penalty of death or to the penalty of life

imprisonment without the possibility of parole?" Watson wrote: "Abuse or murder of child[,] rape."

{¶ 54} "67. In what types of cases/offenses do you feel the death penalty should be imposed?" Watson wrote: "Child abuse/mu[r]der/Rape."

{¶ 55} "69. "As a result of your having been asked to fill out this questionnaire, have you now formed an opinion about this case? If so, please explain." Watson wrote: "I am assuming this is the Mundt's case. My family talked about this case. My nephew went to school with Brittany. This was very upsetting. I have 2 little girls of my own and lots of neice's [sic] and nephew's [sic]. I hate anything to happen to children. Child abuse/mu[r]der [and] rape are the worst things to me. Children are innocent. We as parents are put on this world to protect them."

{¶ 56} "70. "Do you know, or have you seen, heard, or read anything about this case?" Watson checked "Yes" and wrote: "My sister told me about it. I don't know much about it[;] to me it is horrible."

{¶ 57} "71. Please add any additional remarks touching on any of the questions asked or any of the topics bearing on your serving as a juror in this case." Watson wrote: "I will try to be fair in my opinion but I feel very strongly against child abuse, child mu[r]der and sexual abuse/rape."

{¶ 58} On general voir dire, Mundt's trial counsel informed the prospective jurors that Mundt was "charged with the rape, kidnapping and aggravated murder of a seven-year-old girl." He asked the jurors whether any of them had "such strong feelings regarding these crimes that it would be difficult to fairly and impartially weigh the facts at trial where those crimes have been alleged?" Watson raised her hand and stated: "My daughter's seven and it's kind of violent and it bothers me, *but I think I'll be able to handle it.*" (Emphasis added.)

{¶ 59} On individual voir dire, the trial judge asked Watson about pretrial publicity. She said that she did not watch much TV or read the newspaper, but added: "My sister talked about the case and it was upsetting what she told me, though. I don't know anything about it."

{¶ 60} Of the death penalty, she said: "I never really considered it. * * * I don't have a major opinion about it." "I really don't have an opinion. * * * Sometimes, yes, they probably do need the death penalty, yes. I'm not towards it or against the death penalty, either way." Asked if she could weigh mitigating factors and return a life sentence, she said: "I believe I could." When asked whether she could return a death sentence if the state proved that the aggravating circumstances outweighed the mitigating factors, she initially responded: "I don't know. * * * Right now I couldn't tell you." Ultimately, Watson said that she could return a death sentence. However, she would decide the sentence only

"[a]fter everything was done" and would not sign a death verdict with which she disagreed merely because the other 11 jurors agreed to it.

{¶ 61} Mundt's trial counsel declined to ask Watson any questions on individual voir dire and did not challenge her for cause. Watson ultimately served on the jury.

{¶ 62} To establish ineffective assistance, Mundt must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 687–688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373. In this instance, Mundt has not established either element of ineffective assistance of counsel required by *Strickland.*

{¶ 63} We have consistently declined to "second-guess trial strategy decisions" or impose "hindsight views about how current counsel might have voir dired the jury differently." *State v. Mason* (1998), 82 Ohio St.3d 144, 157, 694 N.E.2d 932. See also *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 139; *State v. Murphy* (2001), 91 Ohio St.3d 516, 539, 747 N.E.2d 765; *Bradley,* 42 Ohio St.3d at 143–144, 538 N.E.2d 373.

{¶ 64} "Few decisions at trial are as subjective or prone to individual attorney strategy as juror *voir dire,* where decisions are often made on the basis of intangible factors." *Miller v. Francis* (C.A.6, 2001), 269 F.3d 609, 620. "The selection of a jury is inevitably a call upon experience and intuition. The trial lawyer must draw upon his own insights and empathetic abilities. Written records give us only shadows for measuring the quality of such efforts. * * * [T]he selection process is more an art than a science, and more about people than about rules." *Romero v. Lynaugh* (C.A.5, 1989), 884 F.2d 871, 878. For these reasons, we have recognized that "counsel is in the best position to determine whether any potential juror should be questioned and to what extent." *Murphy,* 91 Ohio St.3d at 539, 747 N.E.2d 765; see also *Bradley,* 42 Ohio St.3d at 143, 538 N.E.2d 373.

{¶ 65} In some cases, asking few or no questions of a prospective juror "may be the best tactic for a number of reasons. For example, questioning by other parties may convince counsel that the juror would be favorable for the defense, and that further questions might only antagonize the juror or give the prosecution a reason to use a peremptory challenge or even grounds for a challenge for cause." *People v. Freeman* (1994), 8 Cal.4th 450, 485, 34 Cal.Rptr.2d 558, 882 P.2d 249.

{¶ 66} Upon review of the entire record, including Watson's voir dire as well as her responses to the questionnaire, defense counsel may have concluded that

Watson "would be favorable for the defense." Watson's voir dire suggests that she was less than a strong supporter of capital punishment. She stated repeatedly that she had no opinion about the death penalty. Asked whether she could return a death sentence, Watson initially answered that she did not know, although she ultimately decided that she could. And she expressed an independent frame of mind: "If that's what I chose, yes, I could sign [a death-sentence verdict]. But if it's just everyone else, it's not what I chose, then I'm not going to sign my name to it." Based on this record, Mundt has not established deficient performance on the part of defense counsel.

{¶ 67} Nor has he established prejudice. When a defendant bases an ineffective-assistance claim on an assertion that his counsel allowed the impanelment of a biased juror, the defendant "*must* show that the juror was *actually biased* against him." (Emphasis added.) *Miller v. Francis,* 269 F.3d at 616, citing *Hughes v. United States* (C.A.6, 2001), 258 F.3d 453, 458. See also *Goeders v. Hundley* (C.A.8, 1995), 59 F.3d 73, 75, citing *Smith v. Phillips* (1982), 455 U.S. 209, 215, 102 S.Ct. 940, 71 L.Ed.2d 78; *Carratelli v. State* (Fla.App.2005), 915 So.2d 1256, 1260–1261.

{¶ 68} Although Mundt argues that Watson was biased, the record does not support that claim. Like the juror in *Miller v. Francis,* 269 F.3d at 617, Watson "never stated that she could not be fair." Cf. *Miller v. Webb* (C.A.6, 2004), 385 F.3d 666, 679 (record supported actual-bias claim where juror expressly admitted bias).

{¶ 69} Nor does anything in the record suggest that Watson had a "close personal relationship," *Miller v. Francis,* 269 F.3d at 617, with the victim or the victim's family. The record shows only that Watson's *nephew* attended school with Brittany. It would be speculative to assume either that this was a close relationship or that it had any influence on Watson. Cf. *Wolfe v. Brigano* (C.A.6, 2000), 232 F.3d 499, 502 (jurors who had close, ongoing relationships with victim's parents and had discussed case with them were biased) with *Miller v. Francis,* 269 F.3d at 617–619 (distinguishing *Wolfe*).

{¶ 70} Neither does Watson's discussion about the case with her sister establish bias. That discussion occurred before Watson was called for jury duty. Watson stated on voir dire that although she and her sister had discussed the case, she "d[id]n't know anything really about it." Thus, the record does not establish that Watson had any extensive or detailed knowledge about the case as a result of the discussion. *Miller v. Francis,* 269 F.3d at 616. Moreover, "[j]urors need not be totally ignorant of the facts and issues involved in the case. * * * '[I]t is beyond question that mere prior knowledge of the existence of the case, or familiarity with the issues involved, or even some preexisting opinion as to the merits, does not in and of itself raise a presumption of jury taint; such a

standard would be certainly unsalutary, and likewise impossible to achieve.'" *Miller v. Francis*, 269 F.3d at 616, quoting *DeLisle v. Rivers* (C.A.6, 1998), 161 F.3d 370, 382.

{¶ 71} Mundt argues that Watson was biased because she was an automatic-death-penalty juror. To the contrary, however, neither Watson's questionnaire nor her voir dire responses support the conclusion that she was an automatic-death-penalty juror. Question 65 of the questionnaire asked prospective jurors to give their opinion of the statement "Persons convicted of murder should be swiftly executed." Watson responded: "I would have to know the case before I could have an opinion."

{¶ 72} On voir dire, after explaining the weighing process and the three life-sentencing options, the prosecutor asked Watson:

{¶ 73} "If these [the aggravating circumstances and mitigating factors] are of equal weight or the mitigating factors are of more weight than the aggravating circumstances, then your verdict would be one of the three of these [life sentences].

{¶ 74} "Could you do that?"

{¶ 75} Watson replied: "I believe I could."

{¶ 76} This record does not establish that Watson harbored any bias. To the contrary, her responses indicated that she would be an open-minded juror. Accordingly, Mundt has not established actual bias or that he suffered prejudice because his attorneys allowed Watson to be seated as a juror. *Miller v. Francis*, 269 F.3d at 616; *Hughes*, 258 F.3d at 458. As Mundt has failed to demonstrate deficient performance of counsel, he has failed to meet the *Strickland* test, and we reject his claim that his counsel rendered ineffective assistance with regard to Watson.

### 2. Voir Dire of Connie Gaydosik

{¶ 77} Mundt contends that his counsel should have challenged Connie Gaydo-sik for cause on the grounds that she was biased in favor of the death penalty. Gaydosik had stated on her questionnaire that "[i]n some cases," death "is the only just punishment." And on voir dire, defense counsel asked Gaydosik whether death "would be the only just punishment" where the jury found the defendant guilty of kidnapping and raping a seven-year-old, then killing her to escape detection. Gaydosik said, "As far as I'm concerned, yes."

{¶ 78} However, immediately after this exchange, defense counsel then asked Gaydosik whether she would still regard death as the only just punishment if the aggravating circumstances of rape, kidnapping, witness-murder, and murder to avoid detection *did not* outweigh the mitigating factors beyond a reasonable

doubt. Gaydosik replied: "Not if the mitigating factors outweighed—if I feel that they outweighed the aggravating circumstances."

{¶ 79} Gaydosik also said on her voir dire: "[I]f you're going to sentence somebody to death or not to death, I'd want to know everything I could about that person before I made a ruling on that." She said that she could consider mitigating evidence offered by the defense, that hearing mitigating evidence would be important, and that whether a murderer should be executed "depends on the circumstances."

{¶ 80} Counsel asked what Gaydosik would do if the aggravating circumstances outweighed the mitigating circumstances "by a preponderance of the evidence." Gaydosik said: "It would depend on what mitigating factors had been presented to me that I had to consider before I could answer that honestly. * * * I mean, frame of mind, the circumstances of how it happened, what happened, all of that. * * * I would have to actually hear [the mitigating factors] to know how to be able to give you an answer on that."

{¶ 81} Finally, Gaydosik said that she would want to hear mitigating evidence before considering death, that she could return a life sentence if the state failed to prove that aggravating circumstances outweighed mitigating factors beyond a reasonable doubt, and that she would not require the defense to prove that mitigation outweighed aggravation. Whether a life sentence was appropriate, Gaydosik said, "would depend * * *; I'd have to see everything proven to me."

{¶ 82} Taken as a whole, Gaydosik's voir dire responses made clear that she was not an automatic-death-penalty juror and would consider mitigating circumstances. These answers would not have supported a challenge for cause, and therefore defense counsel cannot be considered ineffective for failing to make such a challenge.

{¶ 83} Mundt further contends that defense counsel should have removed Gaydosik with a peremptory challenge. But " '[b]ecause the use of peremptory challenges is inherently subjective and intuitive, an appellate record will rarely disclose reversible incompetence in this process.' " *Freeman,* 8 Cal.4th at 485, 34 Cal.Rptr.2d 558, 882 P.2d 249, quoting *People v. Montiel* (1993), 5 Cal.4th 877, 911, 21 Cal.Rptr.2d 705, 855 P.2d 1277. Upon review, this record does not demonstrate "reversible incompetence" in defense counsel's decision not to expend one of the six peremptory challenges on this juror.

{¶ 84} Mundt also contends that his counsel acted unreasonably by failing to question Gaydosik about specific mitigating factors. However, trial counsel is entitled to exercise broad discretion in formulating voir dire questions. See *Group,* 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 139; *Murphy,* 91 Ohio St.3d at 539, 747 N.E.2d 765; *Bradley,* 42 Ohio St.3d at 143–144, 538 N.E.2d 373. We further note that the parties are not entitled to ask about specific

mitigating factors during voir dire. See, e.g., *State v. Wilson* (1996), 74 Ohio St.3d 381, 386, 659 N.E.2d 292.

### 3. Allegation that Defense Counsel Conceded Guilt

{¶ 85} Mundt argues that his counsel rendered ineffective assistance on voir dire by "sound[ing] like a prosecutor" in questioning two jurors. Defense counsel asked the jurors to assume that they found Mundt guilty of "purposely raping an innocent seven-year-old girl," then carrying out "a calculated scheme * * * to escape detection" by kidnapping and killing her. Counsel then asked whether the jurors would consider a life sentence to be "a real punishment" in such a case. Mundt contends that this question, in effect, conceded his guilt.

{¶ 86} This contention is not well taken. Defense counsel's hypothetical question, asking jurors how they would proceed in the sentencing phase *if* they found Mundt guilty, was not a concession of guilt. Mundt's argument assumes that the jurors could not tell the difference, but this assumption is not founded in law or fact.

{¶ 87} Moreover, trial counsel's hypothetical question was designed to ascertain whether any jurors would automatically impose a death sentence upon conviction simply because the crime was heinous, without considering the mitigating factors. Their avenue of learning this was to ask a question emphasizing the heinous nature of the crime. Hence, defense counsel made a strategic decision to phrase the question in this fashion. Mundt has demonstrated neither deficient performance nor prejudice and does not demonstrate ineffective assistance of counsel.

### B. Ineffective Assistance During the Guilt Phase of the Trial

{¶ 88} During the guilt phase of the trial, Mundt contends, his trial counsel rendered ineffective assistance by failing to object in several instances to allegedly inflammatory evidence and alleged prosecutorial misconduct.

### 1. Testimony about Victim's Personality Traits

{¶ 89} First, Mundt complains about the testimony of Homer Blair, Brittany's school-bus driver, and Tim Bowman. Blair testified that Brittany "was a well-behaved girl" who "seemed * * * real bright [and] * * * friendly" and "loved to go to school." Bowman testified that Brittany was "cheerful" when he last saw her, adding, "She was always in a good mood."

{¶ 90} This testimony regarding Brittany's behavior was not part of the state's burden at trial. Counsel's failure to object to it, however, did not amount to deficient performance. "A competent trial attorney might well eschew objecting * * * in order to minimize jury attention to the damaging material." *United States v. Payne* (C.A.7, 1984), 741 F.2d 887, 891. See also *Hodge v. Hurley* (C.A.6, 2005), 426 F.3d 368, 385–386; *State v. Miller* (1988), 44 Ohio App.3d 42,

44, 541 N.E.2d 105; *State v. Tokar* (Mo.1996), 918 S.W.2d 753, 768. Defense counsel could have reasonably calculated that the testimony at issue would do little harm because seven-year-old Brittany would be a highly sympathetic victim in any event.

{¶ 91} Nor was the failure to object prejudicial. The testimony at issue was brief, and the jury was instructed in both phases of trial not to let any consideration of sympathy or prejudice sway its verdict. Hence, it is unlikely that the outcome of the trial would have been different had the testimony been excluded.

### 2. Crime–Scene Testimony

{¶ 92} Next, Mundt challenges the testimony of BCI agent Wilgus. Wilgus described the condition of Brittany's body at the crime scene, and he authenticated five crime-scene photographs depicting the body.

{¶ 93} Mundt appears to argue that Wilgus's testimony lacked relevance and was used solely for its alleged inflammatory effect. This argument lacks merit. Wilgus's testimony established the condition of Brittany's body at the scene and thus corroborated the coroner's subsequent testimony. Wilgus provided relevant and material testimony and counsel's failure to object to it neither constituted deficient performance nor caused prejudice.

### 3. Identification of Victim's Photograph by Mother

{¶ 94} Next, Mundt argues that his trial counsel should have filed a motion in limine to prevent Misty Hendrickson from identifying a predeath photograph of Brittany during her testimony. Mundt does not contest the admissibility of the photograph. See *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 57 (predeath photo of victim admissible). However, because Hendrickson wept when she identified Brittany's photo, Mundt argues that using Hendrickson to identify the photo caused him unfair prejudice.

{¶ 95} Nothing in Ohio law precludes a murder victim's relative from identifying photographs of the decedent. Hence, Mundt's counsel did not err by failing to file a motion to prevent Hendrickson from doing so.

{¶ 96} Moreover, the defense had opened the subject of Hendrickson's emotional reaction to the murder. Before Hendrickson testified, the defense had repeatedly elicited testimony on cross-examination about her unemotional demeanor after her daughter disappeared. Having made an issue of Hendrickson's lack of emotion—a strategic decision whose merits Mundt does not dispute—the defense was in a poor position to ask the trial court to shield the jury from Hendrickson's emotional reaction to her daughter's photo. Hence, we cannot fault Mundt's counsel for failing to make such a request.

#### 4. Failure to Challenge Pathologist's Qualifications

{¶ 97} Mundt also complains that defense counsel enhanced Dr. Murthy's credibility by not objecting to his qualifications as an expert. This claim is wholly speculative. Mundt does not explain how the mere lack of an objection enhanced the doctor's credibility.

{¶ 98} Nor does Mundt explain how his counsel *could* have objected to Dr. Murthy's qualifications. A practicing pathologist since 1966, Murthy had performed between 5,000 and 6,000 autopsies and had testified as an expert over 100 times. He had been a deputy coroner in Cuyahoga County for five years. When he testified at Mundt's trial, he was serving as chief deputy coroner for both Stark and Wayne Counties. He had worked almost 12 years for the Stark County coroner and about five years for the Wayne County coroner. In the face of these qualifications, an objection would not have been well taken. Hence, counsel's failure to object did not constitute deficient performance.

#### 5. Alleged Prosecutorial Misconduct during Direct Examination

{¶ 99} Mundt next complains that his counsel failed to object to the prosecutor interjecting herself as a prop into the trial. This claim stems from three incidents during Murthy's direct examination.

{¶ 100} In explaining the nature of a bruise, Murthy said: "For example * * * if I hit your face—." The prosecutor interjected, "You can use me as your victim, if you want."

{¶ 101} Later, Murthy was explaining that a given amount of force will injure a smaller person more severely than a larger, stronger one. To illustrate this, he remarked that "Mike Tyson may not show this injury. But you take a delicate person *like you* and a small child, the same force will result in larger injury." (Emphasis added.)

{¶ 102} Finally, when Murthy testified that Brittany was 47 inches tall, the prosecutor said: "I'm * * * 58 inches. Would that make her about 47 inches?"

{¶ 103} Mundt asserts, without citation to authority, that the prosecutor committed misconduct in these incidents, and he made no attempt to explain how the prosecutor's actions were either improper or prejudicial. Those actions did not deprive Mundt of a fair trial. See generally *State v. Jackson* (2001), 92 Ohio St.3d 436, 442, 751 N.E.2d 946 (test of prosecutorial misconduct is whether challenged action deprives defendant of a fair trial).

#### 6. Testimony about Defensive Injuries

{¶ 104} Next, Mundt suggests that his counsel should have objected to Murthy's testimony that Brittany had defensive injuries, because Murthy's report did not characterize any of Brittany's injuries as defensive. However, Murthy

was testifying about a matter he had personally observed, the condition of Brittany's body. No rule of law precludes a witness from testifying to his personal observations simply because that witness did not also incorporate those observations into a written report. Accordingly, Mundt's suggestion has no merit.

### 7. Testimony about Victim's Size

{¶ 105} Mundt argues that Dr. Murthy created prejudice against Mundt with testimony that "juxtapose[ed]" Brittany's "physical attributes" with Mundt's. Murthy testified that because Brittany was a frail, petite little girl with delicate skin, her injury was more prominent than when the same force was applied to a "big, husky, strong male with thick skin." When Murthy spoke of a "big, husky, strong male with thick skin," he was not referring to Mundt. He was comparing Brittany's injuries to those that a hypothetical adult victim would have suffered if struck with the same force used on Brittany.

{¶ 106} Murthy's references to Brittany's small size and frailty constituted relevant evidence because they explained the severity of her injuries. A defense objection would have been sustained only if the trial court found the probative value of these references to be "substantially outweighed by the danger of unfair prejudice, or confusion of the issues, or of misleading the jury." Evid.R. 403(A).

{¶ 107} It is speculative, at best, whether the trial court would have so found, since the balancing required by Evid.R. 403(A) is within the broad discretion of the trial court. See *State v. Rahman* (1986), 23 Ohio St.3d 146, 152, 23 OBR 315, 492 N.E.2d 401; *State v. Allen* (1995), 73 Ohio St.3d 626, 633, 653 N.E.2d 675. Accordingly, "counsel could rarely (if ever) be deemed ineffective for failing to object under Evid.R. 403(A)." *State v. Bays* (1999), 87 Ohio St.3d 15, 28, 716 N.E.2d 1126. Accord *State v. Bethel,* 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 171.

{¶ 108} Here, even had counsel objected, the trial court could have admitted this testimony without abusing its discretion. Hence, we cannot say that a reasonable probability exists that the trial would have had a different outcome had counsel objected. Thus, counsel's failure to object was not prejudicial according to the *Strickland* standard.

{¶ 109} Mundt further contends that Murthy made an excessive number of references to Brittany's fragility and the severity of her injuries; consequently, he argues, unfair prejudice outweighed the probative value of Murthy's testimony. It is speculative at best how the trial court might have ruled on such an objection if it had been made. This contention is without merit.

### 8. Allegedly Speculative Testimony

{¶ 110} Dr. Murthy also testified that, inasmuch as Brittany was 47 inches tall and the water in the well was only 36 inches deep, if she could have stood up, she would not have drowned. However, Murthy added, "in view of the * * * multiple injuries, she may not have [had] enough strength to stand on her feet."

{¶ 111} Mundt contends that his counsel should have objected to this testimony as speculative. However, Murthy was not speculating; he was offering his expert opinion, based on his personal observation of Brittany's injuries during the autopsy. Inasmuch as this testimony is not speculative, that is not a proper basis for an objection.

{¶ 112} Mundt further contends that in discussing rigor mortis, Murthy "speculate[d] as to the time of Brittany's death, a critical but missing part of the prosecution's case." Both parts of this contention are wrong. First, time of death was not critical to the state's case. Second, Murthy never gave an opinion as to time of death. He simply testified that rigor mortis had set in, and explained that its presence showed that Brittany had not been found soon after her death.

### 9. Testimony about Vaginal Injuries

{¶ 113} Dr. Bertin, a urologist, assisted in Brittany's autopsy and testified about her vaginal injuries. Mundt claims that his counsel should have objected to Bertin's testimony as inflammatory.

{¶ 114} Bertin described Brittany's vaginal opening as "very much enlarged," "very traumatized," "imploded," "destroyed," and "macerated." He testified that it had been "ripped open" by "something large forced through there with great force." He testified that Brittany's vaginal walls were "very abraded" and had lacerations extending "practically the full length of the vaginal canal" and "all the way through the side walls of the vagina" on either side. He compared her injuries to "forcing something too large into a paper sack where, as you push it in, the sides of the sack tear."

{¶ 115} Bertin's description of Brittany's vaginal injuries was clearly relevant. Thus, Mundt's trial counsel could have objected to this testimony only by invoking the trial court's broad discretion under Evid.R. 403(A). Again, it is at best speculative that the trial court would have excluded this highly relevant testimony under Evid.R. 403(A). Such speculation fails to establish a reasonable probability that the result of the trial would have been different had counsel objected.

### 10. "Editorial Comments" by Witness

{¶ 116} Mundt next accuses Bertin of making "editorial comments" during his testimony, and he claims his counsel should have objected. Again, Mundt simply does not explain what, if any, basis existed for a defense objection. All of the statements complained of are either straightforward descriptions of Brittany's injuries or expert opinions about the type and size of object that would have been needed to inflict such injuries.

### 11. Failure to Cross–Examine

{¶ 117} Mundt also complains that his trial counsel did not cross-examine Bertin. However, he does not show how cross-examination would have helped his case; nothing in the record suggests that Bertin's credibility was subject to any effective challenge.

### 12. Failure to Obtain Expert Assistance

{¶ 118} Mundt contends that his counsel were ineffective because they failed to obtain expert assistance to rebut the state's DNA evidence. But counsel's decision to rely on cross-examination instead of calling an expert witness does not constitute ineffective assistance. *State v. Nicholas* (1993), 66 Ohio St.3d 431, 436, 613 N.E.2d 225, citing *State v. Thompson* (1987), 33 Ohio St.3d 1, 10–11, 514 N.E.2d 407. Moreover, Mundt fails to show a reasonable likelihood that the outcome of the trial would have been different had his counsel obtained a DNA expert. Nothing in the record shows that a defense expert would have given favorable testimony. See *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 97–98.

### 13. Alleged Prosecutorial Misconduct in Closing Argument

{¶ 119} Finally, Mundt contends that during the closing argument of the guilt phase of trial, the prosecutor committed misconduct by repeatedly describing Brittany's rape as brutal, and Mundt claims his trial counsel should have objected. The prosecutor's characterization of Brittany's rape as "brutal" is fair comment. See *State v. Keene* (1998), 81 Ohio St.3d 646, 666, 693 N.E.2d 246. The remainder of the alleged misconduct consists of factual statements that were supported by the evidence. As there was "no meritorious basis for any objections to these comments," defense counsel were not ineffective for failing to object. *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 169, 749 N.E.2d 226.

## C. Penalty Phase

{¶ 120} Mundt contends that he received ineffective assistance of counsel during the penalty phase of the trial when his counsel presented evidence and

argument that damaged his mitigation case and when counsel failed to present available evidence that would have made a "compelling" case for a life sentence.

### 1. Penalty–Phase Evidence Contradicting Defense Guilt–Phase Theory

{¶ 121} During the guilt phase of the trial, defense counsel argued that Mundt, while guilty of rape, had not been proven guilty of kidnapping or murdering Brittany. The jury, however, rejected that argument and convicted Mundt of aggravated murder.

{¶ 122} Mundt's chief claim of ineffectiveness during the penalty phase is that his counsel presented testimony that contradicted their theory of the case during the guilt phase. Further, he claims counsel later compounded this error in closing argument by returning to their guilt-phase theory, which was inconsistent with the testimony of the penalty-phase witnesses.

{¶ 123} During the penalty phase, Mundt presented the testimony of Marsha Heiden, a psychologist and mitigation specialist, and Dr. Sandra McPherson, a psychologist. Heiden interviewed Mundt on several occasions, investigated his background, administered a psychological test, and wrote a report. McPherson also interviewed Mundt; administered, scored, and interpreted psychological tests; reviewed background material gathered by the defense; and arrived at a diagnosis of Mundt's mental condition.

{¶ 124} Heiden noted in her report, and admitted on cross-examination, that Mundt had changed his story. Initially, Mundt told Heiden a story consistent with his guilt-phase position that although he had raped Brittany, he had not taken her to the well or killed her. Mundt later changed his story, admitting to Heiden that he had put Brittany in the well after raping her, first claiming that he had thrown rocks at her, but later stating that he had placed rocks over the well opening and a rock fell on her, and that he acted alone.

{¶ 125} Mundt also gave differing accounts of the crime to Dr. McPherson. McPherson testified that at first, Mundt "admitted to having violated [Brittany] sexually." Mundt told McPherson that he became "extremely frightened" when she began bleeding, and he was going to take her to the hospital, but abandoned that plan because he was afraid of what would happen. Instead, he took her to the well, thinking "that he would leave her there until he figured out what to do." Later, however, Mundt told McPherson that Hendrickson was "the primary aggressor," that she had used a dildo on Brittany, and that Johnny had helped Mundt take the body to the well. McPherson testified: "Fred is not a good historian and tends to respond out of whatever is effective at the moment."

{¶ 126} Mundt argues that defense counsel rendered ineffective assistance by presenting the testimony of McPherson and Heiden because their testimony

revealed that, contrary to the guilt-phase defense theory, Mundt had indeed murdered Brittany.

{¶ 127} Mundt argues that McPherson and Heiden hurt his case in three ways: first, their testimony eliminated any doubt the jury may have retained as to the degree of Mundt's involvement in Brittany's murder, such as whether Mundt was the principal offender;[1] second, it sacrificed defense counsel's credibility, since counsel had argued Mundt's innocence in the guilt phase; third, it "demonized" Mundt.

{¶ 128} In reality however, McPherson and Heiden also gave testimony that was potentially valuable as mitigation. McPherson diagnosed Mundt as having several psychological disorders, including borderline personality disorder. See *State v. Newton*, 108 Ohio St.3d 13, 2006-Ohio-81, 840 N.E.2d 593, ¶ 120 (borderline personality disorder is a relevant mitigating factor). McPherson indicated that those disorders were caused by a factor (an unstable, abused childhood) beyond Mundt's control. Furthermore, she found a causal link between the disorders and the killing of Brittany.

{¶ 129} Mundt's admission to murdering Brittany was part of the information that formed a basis for McPherson's diagnosis. McPherson testified: "I want to know what people think and what they feel in the course of a crime of this type." Mundt's statements were "important" because they illustrated the "thinking process * * * characteristic of [Mundt] when he's under any kind of high arousal state." To McPherson, Mundt's thoughts during the crime exemplified "pure borderline thinking" and thus supported her diagnosis.

{¶ 130} Mundt's borderline thinking also supported McPherson's view that Mundt's disorder caused him to commit the murder. McPherson explained that Mundt engages in "narrow" thinking under stress, focusing only on getting out of the stress-inducing situation. Hence, he tends to act upon "whatever first [comes] to mind," even though his course of action might not make sense. According to McPherson, Mundt became stressed when he realized he was in trouble for raping Brittany. The solution that "first came to mind" was to put her in the well, and Mundt's disorder caused him to focus on that course of action, without considering consequences or alternatives.

{¶ 131} Heiden presented Mundt's life history, which was potentially mitigating in itself, and which McPherson had used in diagnosing Mundt.

{¶ 132} Mundt's contention that the jury may have "harbored * * * doubt as to the level of Mundt's involvement" amounts to speculation and is insufficient to

---

1. The defense argued in the penalty phase that Mundt may not have been the principal offender. The jury had not made a finding on this issue, since it found that Mundt acted with prior calculation and design.

show prejudice. Mundt's guilt-phase theory—that Mundt had raped Brittany, but that Hendrickson, Johnny Mundt, or someone else had kidnapped and murdered her—is implausible and unsupported by credible evidence. Thus, the testimony of McPherson and Heiden was not prejudicial according to the *Strickland* test, because it is not reasonably probable that the penalty-phase outcome would have been different if counsel had forgone their testimony.

{¶ 133} In a capital case, conceding guilt in the penalty phase can be a valid strategy, even when such a concession is inconsistent with the defense guilt-phase position. During the penalty phase, "the jury is not, as at the beginning of the guilt phase, disposed in [the defendant's] favor. Each juror believes beyond a reasonable doubt that [the defendant committed the murder]. * * * [D]espite what [the defendant] may wish it to believe, the jury, and therefore the law, thinks him guilty. * * * Recognizing a verdict of guilty at the penalty phase * * * was simply a sensible concession to the realities of the penalty proceeding in a capital case." *Brown v. Dixon* (C.A.4, 1989), 891 F.2d 490, 499.

{¶ 134} Moreover, it is not necessarily deficient performance for defense counsel to present inconsistent alternative theories to the jury. See generally *Brown v. Rice* (W.D.N.C.1988), 693 F.Supp. 381, 398, reversed in part on other grounds, *Brown v. Dixon* (C.A.4, 1989), 891 F.2d 490, 498–500; *State v. Losee* (Iowa 1984), 354 N.W.2d 239, 244; *Commonwealth v. Iglesias* (1998), 426 Mass. 574, 580, 689 N.E.2d 1315. Nor does a midtrial change in strategy necessarily constitute deficient performance. *Gabourie v. State* (App.1994), 125 Idaho 254, 260, 869 P.2d 571; *State v. Swavola* (App.1992), 114 N.M. 472, 476, 840 P.2d 1238.

{¶ 135} There were advantages, as well as disadvantages, to having Heiden and McPherson testify. Certainly, it would have been desirable for the defense to avoid contradicting its own guilt-phase theory if possible. But here, the defense could avoid such contradiction only by abandoning the significant favorable testimony that Heiden and McPherson had to offer. Defense counsel cannot be criticized for their presentation of testimony from Heiden and McPherson during the penalty phase of the trial and their conduct in doing so does not violate *Strickland*.

{¶ 136} Mundt also contends that his counsel were ineffective because, in their penalty-phase argument, they returned to their earlier theory that Mundt may not have been the principal offender.

{¶ 137} In closing argument, they minimized the reliability and importance of Mundt's "different stories about what happened." Counsel argued that Mundt had grown up "in a home where people lied," and hence should not be expected "to tell the truth either to my experts or the State."

{¶ 138} Counsel then argued that in the guilt phase, the jury "had a reasonable doubt * * * as to whether Fred Mundt was the principal offender in this case

* * * based on the evidence you heard at that time. And you can still have a reasonable doubt as to whether he was the principal offender, even after everything you've heard here. * * * And you can consider that, that reasonable doubt that you had. So that's another mitigating factor."

{¶ 139} Even if counsel's tactical choice did constitute deficient performance, Mundt has not demonstrated that the outcome would have been different but for this argument. In view of the totality of the evidence, it seems improbable that this part of the defense argument changed any juror's opinion as to Mundt's guilt or McPherson's credibility. Hence, it is not likely that the outcome would have been otherwise but for counsel's inconsistent argument.

{¶ 140} Further, as we have already noted, presenting inconsistent alternative theories is not per se deficient performance. "Even assuming the defenses were inconsistent, the decision to advance two different theories of non-culpability is a trial tactic or strategy. It is obvious that defendant's lawyers * * * were presenting any and all possible defenses. Whether the strategy was good or bad, it is a tactic that is not so unreasonable that it shows ineffectiveness." *Losee,* 354 N.W.2d at 244.

{¶ 141} These observations have special relevance to the penalty phase of a capital murder case. In a capital case, the defense can win a life sentence by creating a reasonable doubt in the mind of only one juror, because the jury may recommend a death sentence only by a unanimous vote. See *State v. Springer* (1992), 63 Ohio St.3d 167, 586 N.E.2d 96. And each juror is entitled to consider any mitigating factors that he or she *individually* finds to have been established. See *McKoy v. North Carolina* (1990), 494 U.S. 433, 442–443, 110 S.Ct. 1227, 108 L.Ed.2d 369. Thus, it may well be a valid defense strategy to present any and all possible evidence and arguments in mitigation, even if they conflict, for evidence and arguments that 11 jurors reject may yet persuade the 12th.

{¶ 142} To be sure, such a strategy is not risk-free. It may not be the best strategy in every case. But every case is different, "and an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 143} Due to the nature of Mundt's crime, counsel could have rationally decided to offer the jury a variety of reasons to vote for life, hoping that at least one juror would accept at least one of those reasons. We cannot conclude, therefore, that this constituted ineffective assistance of counsel.

## 2. Presenting Harmful Testimony

{¶ 144} Mundt finds fault with Dr. McPherson's testimony in various ways. First, he argues that she prejudiced him by diagnosing him with pedophilia, based on the fact that he had been found guilty of having raped Brittany.

However, inasmuch as Mundt never contested that he raped Brittany, it is not apparent how this diagnosis prejudiced him.

{¶ 145} Mundt contends that McPherson failed to explain what borderline personality disorder meant. This claim is untrue. McPherson explained borderline personality disorder at length, and she discussed its causes and symptoms with specific reference to Mundt. Mundt also contends that McPherson's testimony regarding Mundt's "borderline thinking" was "nonsensical, inflammatory, unintelligible and clearly not mitigating." However, Mundt fails to explain these assertions and points to nothing in the record that supports them.

{¶ 146} Moreover, his citation of *Skaggs v. Parker* (C.A.6, 2000), 235 F.3d 261, in support of his argument is inapposite. In *Skaggs,* defense counsel were found to be ineffective for using a so-called psychologist in the penalty phase who had no license, degree, or training, but "had completely falsified his credentials," 235 F.3d at 265, and who had previously given "bizarre and eccentric" guilt-phase testimony, id. at 269. In contrast, McPherson's qualifications are undisputed, and her testimony was material and relevant, not bizarre or eccentric.

{¶ 147} Mundt contends that McPherson "destroyed" her own credibility by discussing the Minnesota Multiphasic Personality Inventory ("MMPI–2"), which Mundt had taken as part of the defense psychological evaluation. McPherson found that Mundt overstated responses on the MMPI–2. McPherson did not think the results were "useless," but thought that their value was "limited." Certain "aspects of [Mundt's MMPI–2 profile] could be interpreted, but only as hypotheses to be confirmed in other ways."

{¶ 148} McPherson did not rely heavily on the MMPI–2 in reaching her conclusions, and she forthrightly acknowledged its limited value. Thus, it is unclear how testifying about it undermined her credibility.

### 3. Failure to Present Available Mitigation

{¶ 149} Before trial, defense counsel filed a motion to declare Mundt mentally retarded and therefore ineligible for the death penalty pursuant to *Atkins v. Virginia* (2002), 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335, and *State v. Lott,* 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011. Witnesses at the *Atkins* hearing included Robert Willis and Constance Kline Brady, Ph.D., testifying for the defense, and Jeffrey Stevens, testifying for the state.

{¶ 150} Willis was the special-education supervisor for the Switzerland of Ohio School District. Dr. Brady was a school psychologist who examined students to determine whether they have learning disabilities. Willis and Brady based their testimony on Mundt's school records. Stevens was the vocational special-educational coordinator at Mundt's high school. It was his job to assist learning-disabled ("LD") and developmentally handicapped ("DH") students with their

studies. His testimony was based on personal knowledge of Mundt, as well as Mundt's records.

{¶ 151} Brady testified that, at age 12, when Mundt attended school in the Marietta school district, his IQ scores were 82 and 85, consistent with a learning disability. The Marietta schools had classified Mundt as LD. However, when he later attended high school in the Switzerland of Ohio school district, he was classified as DH. Brady and Willis testified that at the time Mundt was classified as a DH student, an IQ measurement of 80 or less was one of the prerequisites for that designation.

{¶ 152} Stevens testified that Mundt had studied cosmetology in a vocational program. Although Mundt had struggled academically as a DH student, he had performed tasks to the best of his ability. In a 1995 evaluation, Stevens had rated Mundt's daily attendance as good.

{¶ 153} Brady testified that when Mundt was 15, he could read at only a second-grade level. Stevens testified that, as a junior and senior, Mundt read at only a second-grade level and had difficulty with written instructions. It was necessary to speak slowly and clearly to Mundt and to repeat until he understood. Mundt did not retain information well and had a short attention span. Despite receiving special help, he was barely able to keep up with his cosmetology class. He needed extra time to complete most tasks and worked slowly, but persistently.

{¶ 154} Stevens and Willis testified that Mundt had received several "E" grades in high school. Stevens, Willis, and Brady explained that an "E" was a grade given in place of an "F" to a special-education student who had failed to earn a passing grade but had put forth reasonably good effort and done his best.

{¶ 155} Mundt contends that in the mitigation hearing, defense counsel should have called Willis, Brady, and Stevens ("the *Atkins* witnesses") to testify about his academic history and low intelligence. Mundt contends that his low intelligence would have had significant mitigating value. Moreover, he argues, such testimony would have humanized him by showing him as a struggling special-education student who worked hard and tried to achieve despite limited intellectual capability.

{¶ 156} In general, "counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh* (2001), 90 Ohio St.3d 460, 490, 739 N.E.2d 749. See also *State v. Hanna,* 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 118; *State v. Williams,* 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 125. "It may be that often the best strategy in a capital case is to attempt to humanize the defendant by presenting evidence of his personal qualities. We are unable to

hold, however, that any other strategy would be so unreasonable as to constitute ineffective assistance of counsel." *Stanley v. Zant* (C.A.11, 1983), 697 F.2d 955.

{¶ 157} Moreover, in evaluating the performance of counsel, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–691, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 158} Here, the record shows that counsel's decision not to call the *Atkins* witnesses in the penalty phase did not result from any lack of investigation. Cf. *State v. Tyler* (1990), 50 Ohio St.3d 24, 40, 553 N.E.2d 576. Mundt's lawyers knew the *Atkins* witnesses existed and what their testimony would be. They had already presented *that very testimony* at the *Atkins* hearing. Because Mundt's counsel were fully aware of what these witnesses had to say, counsel's decision not to present them in the penalty phase is "virtually unchallengeable." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 159} Moreover, Mundt fails to demonstrate prejudice, i.e., a reasonable likelihood that the outcome of the case would have been otherwise but for the allegedly ineffective assistance. Mundt's contention that being depicted as a struggling special-education student would have humanized him is rank speculation. Mundt's claim that the jury would have found this evidence compelling is equally speculative.

{¶ 160} Finally, even without the *Atkins* witnesses, evidence of Mundt's low intelligence was placed before the jury in the penalty phase. Mundt's school records showed that his IQ ranged between 78 and 85, as measured by Stanford–Binet and Wechsler Intelligence Scale for Children tests administered during childhood. Dr. McPherson testified that Mundt's intelligence, as reflected by intelligence test scores, was below average; that he had difficulty in school, especially with reading, memory, and attention; that he had been placed in a "developmentally handicapped section" and had been diagnosed with attention-deficit disorder; and that his "limited" intellectual resources contributed to his tendency to avoid problems instead of trying to solve them.

{¶ 161} At most, the *Atkins* witnesses would have corroborated the other evidence of Mundt's low intelligence and emphasized its mitigating value. However, there is no reason to assume that the jury would have given Mundt's low intelligence decisive weight if the *Atkins* witnesses had testified. Indeed, juries often recommend death sentences despite a defendant's low intelligence. See, e.g., *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 264; *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 139; *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 109; *State*

*v. Rojas* (1992), 64 Ohio St.3d 131, 143, 592 N.E.2d 1376. Thus, no evidence exists that the testimony of the *Atkins* witnesses would have changed the outcome of the penalty phase.

{¶ 162} Mundt also contends that defense counsel's argument failed to lay sufficient emphasis on Mundt's lack of a significant criminal record. However, defense counsel did discuss this mitigating factor in the defense opening statement, and in closing argument as well. The degree of emphasis to be given any individual mitigating factor in argument is a matter of trial strategy, and Mundt fails to demonstrate deficient performance.

{¶ 163} After thorough review, we conclude that Mundt failed to demonstrate that his counsel rendered ineffective assistance during voir dire, during the guilt phase, or during the penalty phase of the trial. Accordingly, we overrule the first proposition of law.

## II. Waived Issues

### A. Voir Dire

{¶ 164} In the second proposition of law, Mundt claims that the *trial court* failed to conduct a sufficient voir dire of prospective juror Watson. Mundt contends that the trial court had a duty to question Watson concerning whether she would automatically vote for a death sentence, even though Mundt's counsel chose not to ask such questions.

{¶ 165} No such duty exists. "There is no requirement for a trial court to 'life qualify' any prospective juror, absent a request by defense counsel, in a capital murder case." *State v. Stojetz* (1999), 84 Ohio St.3d 452, 705 N.E.2d 329, syllabus. Rather, the trial court must inquire into the prospective juror's views, or else allow defense counsel to do so, *if the defendant so requests*. See *Morgan v. Illinois* (1992), 504 U.S. 719, 735–736, 112 S.Ct. 2222, 119 L.Ed.2d 492.

{¶ 166} *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, is not to the contrary, and Mundt's citation to that case is inapposite. *Jackson* neither holds nor implies that a trial court must conduct a *Morgan* inquiry sua sponte. Rather, *Jackson* involved an improper restriction on the scope of defense voir dire: "The trial court erred when it held that appellant was not entitled to have prospective jurors informed that one of the murder victims was three years old." Id. at ¶ 49.

{¶ 167} Here, the trial court imposed no restriction on defense questioning. The defense *chose* not to question Watson. Since the trial court had no duty to conduct a *Morgan* inquiry sua sponte, we reject Mundt's second proposition of law.

## B. Prosecutorial Misconduct

{¶ 168} In his third proposition of law, Mundt contends that the prosecutors committed numerous acts of misconduct that denied him a fair trial in both phases.

{¶ 169} Mundt never objected to any of the alleged prosecutorial misconduct. Thus, he waived his right to claim error. In order to overcome the waiver, a complaining party must demonstrate plain error. An alleged error is plain error only if the error is "obvious," *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240, and "but for the error, the outcome of the trial clearly would have been otherwise," *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. Under this standard, Mundt has not demonstrated plain error with respect to these issues. Therefore, Mundt's third proposition of law is overruled.

## C. Evidentiary Issues

{¶ 170} In his fourth proposition of law, Mundt contends that the admission of victim-impact evidence in the guilt phase violated his constitutional rights. The record reveals that at trial, the defense did not object to any of the evidence at issue here. These claims are thus waived unless Mundt demonstrates plain error. He has not done so, and, therefore, Mundt's fourth proposition of law is overruled.

{¶ 171} In his sixth proposition of law, Mundt contends that the testimony regarding the injuries inflicted on Brittany should have been excluded as inflammatory and repetitive. Again, Mundt did not object to this evidence at trial, so this proposition is waived. The admission of the evidence in question does not amount to plain error. We overrule Mundt's sixth proposition of law.

## D. Guilt–Phase Instructions

{¶ 172} In his seventh proposition of law, Mundt contends that the trial court's instruction on Count 7 (kidnapping) was flawed. The trial court instructed: "If you find the Defendant guilty of kidnapping * * *, you will further consider whether the Defendant did or did not release the victim in a safe place, unharmed." See R.C. 2905.01(C) (release of victim unharmed in a safe place reduces kidnapping from first-degree felony to second-degree felony).

{¶ 173} The trial court did not need to give this instruction, as Mundt never raised the issue of whether the victim was released unharmed in a safe place. See *State v. Sanders* (2001), 92 Ohio St.3d 245, 265, 750 N.E.2d 90. However, Mundt did not object to it at trial. Hence, he has waived this issue, unless he can show plain error. His assertion that the instruction prejudiced him is speculative. See id. at 265, 750 N.E.2d 90; *State v. McKnight*, 107 Ohio St.3d 101, 2005-

Ohio-6046, 837 N.E.2d 315, ¶ 234. Further, he has not demonstrated that the outcome of the trial clearly would have been otherwise but for the error. Therefore, we overrule this proposition of law.

{¶ 174} In the eighth proposition of law, Mundt contends that the trial court's instruction on causation [2] shifted the burden of proof on the issue of purpose to kill. Mundt did not object to this instruction at trial. The issue is therefore waived, absent plain error.

{¶ 175} Plain error does not exist here. The trial court instructed the jury that it must find purpose to kill in order to convict Mundt of aggravated murder. *State v. Phillips* (1995), 74 Ohio St.3d 72, 100, 656 N.E.2d 643. See also *Byrd v. Collins* (C.A.6, 2000), 209 F.3d 486, 527. This proposition of law is not well taken.

### E. Penalty–Phase Instructions

{¶ 176} In his fifth proposition of law, Mundt contends that the trial court erred in the penalty phase by instructing that although counsel's arguments were not evidence, the jury could "consider the arguments of counsel to the extent that they [were] relevant to the sentence that should be imposed." Mundt claims that this instruction allowed the jurors to give "undue consideration" to the state's argument.

{¶ 177} However, Mundt did not object at trial, waiving the issue absent plain error. The instruction was not plain error. It was neutral as between prosecution and defense, and Mundt does not explain how it could cause the jurors to give *undue* consideration to the prosecutor's argument.

{¶ 178} Mundt's failure to object waives this claim, and as there is no plain error, we overrule this proposition of law.

{¶ 179} In his tenth proposition of law, Mundt argues that the trial court erred in the penalty phase by instructing the jury to consider guilt-phase evidence only if "relevant to the aggravating circumstances and to any of the mitigating factors." See *State v. Getsy* (1998), 84 Ohio St.3d 180, 201, 702 N.E.2d 866 (it is trial judge's duty to determine what evidence is relevant in penalty phase).

{¶ 180} But, again, Mundt did not preserve this claim at trial, either by objecting to the instruction or by seeking the exclusion of any allegedly irrelevant evidence. "Thus, he has waived any objection relating to the relevance of specific items," *State v. Cowans* (1999), 87 Ohio St.3d 68, 87, 717 N.E.2d 298, and cannot prevail unless he shows plain error. He has not.

{¶ 181} Plain error does not exist here because the alleged error did not cause the jury to consider any *irrelevant* guilt-phase evidence in the penalty phase.

---

2. " 'Cause' occurs when the death is the natural and foreseeable result of the act or failure to act."

The guilt-phase evidence that Mundt identifies as irrelevant was Agent Wilgus's testimony about the condition of Brittany's body at the crime scene and Murthy's testimony about the severity of Brittany's injuries. However, this evidence was relevant to the nature and circumstances of the aggravating circumstances, which the jury *must* consider in the penalty phase. R.C. 2929.03(D)(1). See *State v. DePew* (1988), 38 Ohio St.3d 275, 282–283, 528 N.E.2d 542.

{¶ 182} Because the testimony of Wilgus and Murthy was relevant to the penalty phase, the jury would have considered it even had the trial judge issued a more specific instruction. Hence, the alleged instructional error was not out-come-determinative, and no plain error occurred. See *State v. Lindsey* (2000), 87 Ohio St.3d 479, 485, 721 N.E.2d 995; *State v. Fears* (1999), 86 Ohio St.3d 329, 345–346, 715 N.E.2d 136. We overrule Mundt's tenth proposition.

## III. Constitutionality of Death Penalty

{¶ 183} In his 11th proposition of law, Mundt raises long-settled issues attacking the constitutionality of Ohio's death-penalty statutes. We overrule these claims summarily. See generally *State v. Spisak* (1988), 36 Ohio St.3d 80, 82, 521 N.E.2d 800; *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

## IV. Independent Sentence Review

{¶ 184} In his ninth proposition of law, Mundt contends that death is not the appropriate sentence in this case. This proposition invokes our statutorily mandated independent review.

### Aggravating Circumstances

{¶ 185} After the trial court's merger of specifications, two aggravating circumstances remain: R.C. 2929.04(A)(3) (murder to escape detection, apprehension, trial, or punishment) and R.C. 2929.04(A)(7) (murder while committing kidnapping). The record supports the jury's finding of these aggravating circumstances.

### Mitigating Factors

{¶ 186} Mundt cites his history, character, background, low intelligence, and mental disorders as mitigating. He also claims that he has no significant criminal history, a mitigating factor under R.C. 2929.04(B)(5). Finally, he contends that his good behavior in jail, his lack of future dangerousness while imprisoned, and his remorse are mitigating "other factors" under the catchall provision of R.C. 2929.04(B)(7). At trial, he also claimed his youth was a mitigating factor under R.C. 2929.04(B)(4).

{¶ 187} The record demonstrates that Mundt was a special-education student, and that the Marietta school system classified him as learning-disabled. By 1989, when he was attending school in the Switzerland of Ohio district, Mundt had been reevaluated as developmentally handicapped. IQ tests administered during his scholastic career indicate that his intellectual functioning was "borderline." However, he attended school and earned several grades of "E," meaning that he put forth his best effort but did not qualify for a passing grade.

{¶ 188} In 1995, Mundt applied for Social Security disability payments, claiming to be mentally retarded. After he took a Wechsler Adult Intelligence Scale ("WAIS") examination, his application was granted. The 1995 WAIS indicated an IQ of 49. Mundt's benefits were terminated in 2002, when his work income exceeded the allowable amount, but were reinstated in 2004.

{¶ 189} Dr. David Ott, the state's expert witness in psychology, interviewed Mundt before trial. In the penalty phase, Dr. Ott testified that his observations of Mundt were "very inconsistent with" an IQ of 49 and indicated a much higher level of functioning than others in that range. According to Dr. Ott, a person with a 49 IQ would need 24–hour supervision. Moreover, Mundt's IQ ranged between 78 and 85 when measured by IQ tests administered in childhood. Ott concluded that Mundt had "intentionally underperformed" on the WAIS in order to get disability payments.

{¶ 190} Mundt's low intelligence and the efforts that he made in high school despite that handicap are mitigating factors under R.C. 2929.04(B)(7). See, e.g., *State v. Green* (1993), 66 Ohio St.3d 141, 153, 609 N.E.2d 1253. However, their mitigating value is affected by Mundt's malingering on IQ tests as an adult, in order to obtain disability benefits.

{¶ 191} Mundt contends that his childhood was one of "chaos, abuse, and neglect," which caused him to suffer from borderline personality disorder.

{¶ 192} The evidence confirms that Mundt had an unstable childhood. His mother, Sarah Mundt, had children by four different fathers, and seven of her eight children were born out of wedlock. The family moved frequently during his childhood. In 1975, a children's protective agency removed Mundt from Sarah Mundt's custody for approximately one month. In 1979 or 1980, Sarah voluntarily surrendered custody of her children because she had no home.

{¶ 193} During his childhood, children's services agencies investigated numerous reports of abuse and neglect in Sarah Mundt's household. However, some of these reports were unsubstantiated.

{¶ 194} Dr. Ali Melhem, a psychiatrist, testified that he treated Mundt from December 2003 to February 2004. Melhem initially suspected bipolar disorder

and intermittent explosive disorder, but ultimately diagnosed Mundt as having bipolar disorder.

{¶ 195} Mundt also presented evidence that he suffered from borderline personality disorder. Dr. McPherson interviewed Mundt, tested him, discussed his background with the mitigation specialist, and reviewed his Social Security, school, mental-health, and children's services records.

{¶ 196} Dr. McPherson gave Mundt the MMPI–2 test, the Rorschach test, and the Thematic Apperception Test ("TAT"). McPherson found that Mundt over-stated his responses on the MMPI–2. Nevertheless, McPherson felt that the MMPI–2 results "were not useless." Some features of the MMPI–2 were consistent with aspects of his life history, such as childhood abuse, drug use, and depression.

{¶ 197} McPherson's examination of Mundt led her to conclude that "under threat, he tends to deal with the world by narrowing perception," i.e., by refusing to be aware of problems. Thus, "[w]hen a problem presents itself, he's mainly going to look for a way to get away from it, rather than a way to deal with it." Mundt's low intelligence also contributes to this tendency.

{¶ 198} Moreover, Mundt "doesn't process emotion" and lacks a normal capacity to identify with another person's pain. He tends to "blam[e] the world" for his problems "as opposed to looking within." He has a "negative self concept" and is not goal-oriented.

{¶ 199} According to Dr. McPherson, narrow perception, low capacity for emotional response, and externalizing blame are characteristic qualities of per-sons who have been traumatized or suffered early abuse.

{¶ 200} Dr. McPherson diagnosed Mundt as having depression, posttraumatic stress disorder, pedophilia, and borderline personality disorder. McPherson noted that bipolar disorder and borderline disorder "overlap substantially," and she was not "in substantial disagreement" with Dr. Melhem's diagnosis of bipolar disorder. However, Mundt was not psychotic or schizophrenic; in fact, he had no major mental illness.

{¶ 201} Mundt told McPherson that during the crime, he had thought about "himself getting messed with" as a child and thought "it might be okay" if he "messed with" Brittany. According to McPherson, this was "pure borderline thinking," illustrating "a confusion of identity" and the "notion that somehow this reduces responsibility." McPherson believed that when confronted with an upsetting situation, Mundt simply does whatever first comes to mind, whether it makes sense or not, and that he did so in this case.

{¶ 202} According to Dr. Ott, Mundt's malingering invalidated the MMPI–2 results. Dr. Ott also questioned the validity of the TAT results. In Dr. Ott's

view, Mundt's responses to the TAT were consistent with his pattern of "impression management."  Ott also testified that the TAT itself is "controversial," particularly for courtroom use, because no norms for interpreting responses exist, allowing for "considerable subjectivity" on the part of the examiner.

{¶ 203} Mundt's history, character, and background evidence depicts a person who, because of factors beyond his control—an unstable home, alleged childhood abuse and neglect, a personality disorder, and low intelligence—lacks the ability to empathize with others or to deal appropriately with a situation.

{¶ 204} While there is evidence that supports this picture, the record also contains evidence that tends to refute it.  Dr. McPherson admitted that Mundt had overstated his psychological symptoms and that his word was unreliable.  Ott testified that two tests McPherson had used to reach her diagnosis were of questionable validity because of Mundt's malingering and because one of them (the TAT) is interpreted subjectively.

{¶ 205} We accord little weight to Mundt's personality disorders as a mitigating "other factor."  See *State v. Taylor* (1997), 78 Ohio St.3d 15, 33, 676 N.E.2d 82.  Furthermore, Mundt's upbringing is entitled to little weight in mitigation.  Cf. *State v. Murphy* (2001), 91 Ohio St.3d 516, 547, 747 N.E.2d 765; *State v. Campbell* (2002), 95 Ohio St.3d 48, 51–54, 765 N.E.2d 334.

{¶ 206} This court recently reversed a death sentence largely on the basis of the defendant's upbringing.  See *State v. Tenace,* 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386.  *Tenace,* however, is distinguishable.  Tenace's parents lived criminal lifestyles and actively encouraged the defendant and his siblings to commit crimes.  Id. at ¶ 88–90, 96, 101–103.  The record in this case presents nothing comparable to *Tenace.*  Moreover, Mundt's siblings overcame their upbringing; at least two were employed, and all but Johnny were law-abiding. This was not the case in *Tenace.*  See id. at ¶ 82, 96, 102.

{¶ 207} Mundt contends that he lacks a "significant history of criminal convictions," R.C. 2929.04(B)(5), and the state concedes the existence of this mitigating factor.  However, Mundt has a prior misdemeanor conviction for domestic violence against his first wife, Dana Anderson, for which he served a 30–day sentence.

{¶ 208} This factor of lack of criminal history is entitled to little weight. Mundt's prior conviction was for domestic violence, and the instant case also involves violence against a member of Mundt's household.  Moreover, Dr. McPherson testified that Mundt "is dangerous * * * in a domestic context because * * * he will do something stupid and something terrible at times."

{¶ 209} McPherson testified that, although Mundt had committed crimes in a domestic context, he would probably not engage in aggression if incarcerated.

This is evidence in mitigation that we consider, for "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating." *Skipper v. South Carolina* (1986), 476 U.S. 1, 5, 106 S.Ct. 1669, 90 L.Ed.2d 1.

{¶ 210} Mundt claims that his good behavior in jail is a mitigating factor. Good behavior in jail is relevant to lack of future dangerousness: "[T]he lack of a prison disciplinary record reveals nothing about a defendant's character except that the defendant can exist in the highly structured environment of a prison without endangering others." *Franklin v. Lynaugh* (1988), 487 U.S. 164, 186, 108 S.Ct. 2320, 101 L.Ed.2d 155 (O'Connor, J., concurring). See also *Skipper*, 476 U.S. at 5, 106 S.Ct. 1669, 90 L.Ed.2d 1.

{¶ 211} According to the Noble County jail administrator, Mundt created no disciplinary problems during almost nine months of pretrial incarceration. However, during this entire period, Mundt was assigned to a room visible to guards at all times. He had no contact with any inmate except trusties, and no unsupervised contact with any inmate. Mundt's good behavior under these circumstances is given little weight.

{¶ 212} Mundt expressed remorse in his unsworn statement and in allocution. In the unsworn statement, he told the jury he was "very sorry * * *. I know I was wrong and I ask you to spare my life." In allocution, he said: "I am sorry for what I did wrong. I'm very, very sorry for Misty's family. I wish it had never happened. * * * I'm just very sorry for what I done." These expressions of remorse deserve little weight. See *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 119; *State v. Post* (1987), 32 Ohio St.3d 380, 394, 513 N.E.2d 754.

{¶ 213} At trial, Mundt argued that there was doubt as to whether he was the principal offender in the murder. *"If the offender was * * * not the principal offender*, the degree of the offender's participation in the offense and * * * in the acts that led to the death of the victim" must be considered in mitigation. (Emphasis added.) R.C. 2929.04(B)(6). However, overwhelming evidence shows that Mundt *was* the principal offender; indeed, no substantial, credible evidence suggests that anyone else was involved. This factor deserves no weight in mitigation.

{¶ 214} During the penalty phase, Mundt requested that the jury be instructed on his youth, R.C. 2929.04(B)(4), as a mitigating factor. However, because Mundt was 29 years old at the time of the offense, R.C. 2929.04(B)(4) does not apply.

## Proportionality Review

{¶ 215} Mundt's death sentence is proportionate to sentences we have approved in similar cases. See *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571,

853 N.E.2d 621; *State v. Bies* (1996), 74 Ohio St.3d 320, 658 N.E.2d 754; *State v. Gumm* (1995), 73 Ohio St.3d 413, 653 N.E.2d 253; *State v. Phillips* (1995), 74 Ohio St.3d 72, 656 N.E.2d 643.

{¶ 216} Accordingly, the judgment of the trial court is affirmed.

Judgment affirmed.

MOYER, C.J., PFEIFER, LUNDBERG STRATTON, O'CONNOR, LANZINGER and CUPP, JJ., concur.

---

Robert B. Watson, Noble County Prosecuting Attorney, and Heather L. Gosselin, Special Assistant Prosecuting Attorney, for appellee.

David H. Bodiker, Ohio Public Defender, and Richard J. Vickers and Linda E. Prucha, Assistant State Public Defenders, for appellant.