[Cite as *State v. Jones*, 2014-Ohio-2228.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| STATE OF OHIO | | C.A. No. 12CA010262 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| CHRISTOPHER F. JONES | | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | | CASE No. 11CR082800 |

DECISION AND JOURNAL ENTRY

Dated: May 27, 2014

BELFANCE, Presiding Judge.

{¶1} Appellant Christopher F. Jones appeals his convictions for rape and importuning from the Lorain County Court of Common Pleas. For the reasons set forth below, we affirm.

I.

{¶2} In August 2010, Mr. Jones came to stay with L.J., L.J.'s mother ("Mother") and L.J.'s three-year-old brother. L.J. was 12 years old at the time. Mother's cousin and his girlfriend Tonya Portis were also staying with them. One evening, Mr. Jones was in the basement bedroom with Mother's cousin, Ms. Portis, and L.J. L.J. was lying down on the bed, and Mr. Jones sat on the bed. According to L.J., the lights were turned off, and Mr. Jones moved her shorts to the side before inserting his penis into her vagina. Mr. Jones withdrew from L.J. when Mother came downstairs. During a power outage a few days later, Mr. Jones had L.J. perform fellatio on him in the basement.

**{¶3}** About ten days after the first incident, L.J. told Mother about what had happened between her and Mr. Jones. However, Mother did not file a formal report with the police because the police told her that, without evidence, it would be L.J.'s word against Mr. Jones' word. In November 2010, Mother discovered L.J. chatting with Mr. Jones through Facebook. During the chat session, Mr. Jones had told L.J. to delete all of the messages between them but later used sexually explicit language referring to both past and possible future sexual conduct between himself and L.J. Mother took L.J.'s computer away and called the police.

**{¶4}** Mr. Jones was indicted for rape and importuning and pleaded not guilty. The jury found him guilty of both counts, and the court sentenced Mr. Jones to consecutive terms of ten years to life in prison for rape and 36 months for importuning. The court also found Mr. Jones to be a Tier III sex offender.

**{¶5}** Mr. Jones has appealed, raising three assignments of error for our review. To facilitate our analysis, we have rearranged Mr. Jones' assignments of error.

II.

ASSIGNMENT OF ERROR III

THE GUILTY VERDICTS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE ONE, SECTION 10 OF THE OHIO STATE CONSTITUTION.

**{¶6}** In his third assignment of error, Mr. Jones argues that his convictions are against the manifest weight of the evidence. We disagree.

**{¶7}** In reviewing a challenge to the weight of the evidence, the appellate court

[m]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest

miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten,* 33 Ohio App.3d 339, 340 (9th Dist.1986).

**{¶8}** The jury found Mr. Jones guilty of rape of a minor under thirteen years of age pursuant to R.C. 2907.02(A)(1)(b), which provides, "No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." Sexual conduct is

> vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

R.C. 2907.01(A).

**{¶9}** The jury also found Mr. Jones guilty of importuning pursuant to R.C. 2907.07(A), which states, "No person shall solicit a person who is less than thirteen years of age to engage in sexual activity with the offender, whether or not the offender knows the age of such person." Sexual activity is "sexual conduct or sexual contact, or both." R.C. 2907.01(C). R.C. 2907.01(B) defines sexual contact as

> any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person.

After a thorough review of the record, we cannot say that the jury committed a manifest miscarriage of justice when it found Mr. Jones guilty of rape and importuning.

**{¶10}** Four witnesses testified for the State: L.J., Mother, Officer Richard Buckway of the Elyria Police Department, and Detective Randall Young of the North Ridgeville Police Department. L.J. testified that, in August 2010, she was 12 years old and living with Mother

when Mr. Jones came to stay with them for a few days. One evening, Mother's cousin, Ms. Portis, and L.J. were in the basement bedroom listening to music and using laptops. L.J. was lying on the bed while Mother's cousin and Ms. Portis were on a nearby couch.

{¶11} According to L.J., Mr. Jones came downstairs and sat down next to her on the bed. At some point, the lights in the basement were turned off. L.J. felt Mr. Jones move her shorts to one side and Mr. Jones' penis enter her vagina. Mr. Jones withdrew after a few seconds because Mother was coming downstairs. Mother took L.J. upstairs where L.J. sat on the couch and cried. When Mr. Jones came upstairs to lie on the couch, Mother told L.J. to go to bed.

{¶12} During a power outage a day or two later, L.J. went down to the basement, and Mr. Jones came downstairs after her. Mr. Jones unbuttoned his pants and had L.J. perform fellatio on him for a few seconds before Mother's cousin began to come downstairs. L.J. eventually told Mother about the incidents, and Mother took her to the doctor.

{¶13} A few months after these incidents occurred, L.J. was chatting with Mr. Jones on Facebook while she was in the basement one evening. L.J. told Mr. Jones that she had told Mother what had happened between them. Mr. Jones told L.J. to delete every message she had sent to him.

{¶14} Since it was very late, Mother came downstairs and asked L.J. why she was using the computer. Mother saw the Facebook messages between Mr. Jones and L.J. and took the computer from L.J. When Mother asked how many times there had been sexual contact between her and Mr. Jones, L.J. responded that sexual contact had happened "'[o]nly the time [she] told [Mother.]'" Mother called the police, and a police officer came to the house. The officer spoke with L.J., and Mother showed the officer the computer screen and pictures she had taken of the screen.

{¶15} L.J. gave a statement to Detective Dietsche of the Elyria Police Department. With respect to the first incident in the basement, she told Detective Dietsche that her head was at one end of the bed, that Mr. Jones's head was at the other end, and that her leg was up. However, she was not comfortable talking to Detective Dietsche about the fact that Mr. Jones had penetrated her with his penis. According to L.J., she felt the need to protect Mr. Jones because she viewed him as a family member.

{¶16} Mother testified that she had known Mr. Jones for about five years. In August 2010, Mother offered to have Mr. Jones stay at her house when he needed a place to stay. Mr. Jones stayed with Mother and her family for three days. The first night that Mr. Jones stayed at the house, Mother became concerned when the house was very quiet because she knew that her cousin, Ms. Portis, Mr. Jones, and L.J. were in the basement to make music. Mother opened the basement door and became more concerned when she noticed the basement lights were off. She went downstairs and opened the door to the other half of the basement, which was her oldest daughter's bedroom.[1] The lights were off in the bedroom as well. Mother saw L.J. lying on the bed with her head at the foot of the bed and Mr. Jones lying on the bed with his head at the head of the bed.

{¶17} Since seeing Mr. Jones lying on the same bed as L.J. made her feel uneasy, Mother told L.J. to come upstairs. She thought that she might have been overreacting, so she did not make an issue out of what she had seen. Mother planned to let L.J. lie down on the couch, but told L.J. to go to bed when Mr. Jones came upstairs about 15 seconds after they did and proceeded to lie down on the couch.

---

[1] Mother's oldest daughter was not living with her at the time.

{¶18} Ten days later, L.J. told Mother that there had been two or three incidents between her and Mr. Jones. Mother called her gynecologist early the next morning for an examination for L.J. The gynecologist tested L.J. for pregnancy and sexually transmitted diseases. Mother also anonymously spoke to a juvenile detective and learned that, if there was no evidence, it would be L.J.'s word against Mr. Jones's word.

{¶19} In November 2010, Mother fell asleep on her couch one evening. When she woke up, she went downstairs and found L.J. using the computer even though it was past L.J.'s curfew for computer use. Mother looked at the computer screen and saw that L.J. was talking to Mr. Jones via Facebook. She asked why L.J. was talking to Mr. Jones, and L.J. became upset. The Facebook messages Mother read were "some of the most heinous things [she had] ever seen anybody say to a child."

{¶20} Mother called the police department, asking an officer to come to the home so she could file a report now that she had evidence of Mr. Jones's behavior toward L.J. To ensure that the messages between Mr. Jones and L.J. were not erased, Mother took pictures of some of the messages with her cell phone. Around 4:00 a.m., Elyria police officer Richard Buckway came to Mother's home. Mother told Officer Buckway that she had called the police because some of her daughter's Facebook messages were sexually explicit. Officer Buckway viewed the messages and saw that they included discussion of L.J. touching her vagina. When attempts to take screenshots or cut and paste the messages did not work, Officer Buckway wrote the messages in his notebook. Eventually, Officer Buckway and Mother were able to get some of the messages into her e-mail. Mother sent those messages to Officer Buckway, who forwarded them to the detective bureau.

{¶21} Detective Randall Young of the North Ridgeville Police Department testified that in January 2011, Detective Dietsche asked him to examine Mother's computer and attempt to recover any Facebook messages. Detective Young recovered over 1,300 Facebook messages and put them on a disk for Detective Dietsche. Not all of the messages were between Mr. Jones and L.J.

{¶22} Four witnesses testified for the defense: Mr. Jones, Mother's cousin, Ms. Portis, and Detective Dietsche. Mr. Jones' testimony generally contradicted L.J.'s testimony. Mr. Jones testified that in July 2010, Mother offered him a place to stay at her house, and he stayed with Mother and her family for a week. One night, Mr. Jones went downstairs. Mother's cousin, Ms. Portis, and L.J. were in the basement, and the lights were on. Mr. Jones lay down at the other end of the queen-size bed from L.J. so that his head was at the head of the bed and fell asleep instantly. When Mr. Jones awakened, the lights were off, and L.J. was gone.

{¶23} According to Mr. Jones, there was a power outage a day or two later. During the power outage, he thought that L.J. went down to the basement, but he did not follow her to the basement, instead choosing to go out to the garage and smoke. He denied writing the sexually explicit Facebook messages to L.J., denied having sexual intercourse or fellatio with L.J., and denied asking L.J. for sexual intercourse or fellatio.

{¶24} Mother's cousin testified that he and Ms. Portis lived with Mother in 2010 and that Mr. Jones lived with Mother for about a week of that time. One night, Mother's cousin and Ms. Portis were sitting in the basement while Mr. Jones and L.J. were on the bed. The power was out, so the lights were out. He did not see any physical contact between Mr. Jones and L.J. Mother came downstairs and asked either Mr. Jones or L.J. to come upstairs. Mother's cousin

was awake the whole time that Mr. Jones and L.J. were in the basement, and he believed that both of them were also awake the whole time.

{¶25} Ms. Portis testified that during the time she and Mother's cousin lived with Mother, Mr. Jones also lived there for less than a month. At one point, Mother's cousin and Ms. Portis were lying on the couch in the basement while Mr. Jones and L.J. were sitting on the bed a couple inches apart. Mother came downstairs, got Mr. Jones, and the two of them went upstairs to the attic. A few minutes later, L.J. went upstairs, possibly to her room. Ms. Portis did not see any sexual conduct between Mr. Jones and L.J.

{¶26} Detective Lisa Dietsche testified that she was assigned to the case on November 29, 2010. She received three pages of medical records from Elyria Memorial Hospital, visited Mother's home, and took Mother's computer to search. She spoke to L.J., Mother, Mr. Jones, Officer Buckway, Detective Young, Children's Services, and L.J.'s older sister. She was not able to speak to Mother's cousin and Ms. Portis.

{¶27} Detective Dietsche testified that she interviewed L.J. and Mother separately on November 29 and that she recorded both interviews. From her ten-year experience with interviewing persons involved in sex cases, Detective Dietsche felt that L.J. was not being totally honest with her. L.J. was not initially comfortable speaking to Detective Dietsche, but seemed to become more comfortable later.

{¶28} L.J. told Detective Dietsche that she and Mr. Jones were lying with their heads at opposite ends of the bed and that Mr. Jones moved her leg and moved her shorts to one side. She did not scream because it did not hurt. According to L.J., Mr. Jones ejaculated in her mouth while she was performing fellatio on him. L.J. was concerned that Mother would blame her for the sexual activity, and Detective Dietsche told L.J. that she could not consent to have sex

because she was too young to consent. After her investigation, Detective Dietsche compiled a report.

**{¶29}** Mr. Jones argues that the jury could not have believed L.J.'s testimony about the incident of sexual intercourse because, if it had actually occurred, Mother's cousin and Ms. Portis would have probably noticed. In addition, Mr. Jones points to L.J.'s testimony that "[i]t was possible" that she lied to the police during the investigation. However, the jury was charged with evaluating the credibility of the witnesses as they testified and resolving conflicts in the testimony. Given the evidence in this case, we cannot say that the jury's credibility determinations were unreasonable. *See State v. Andrews,* 9th Dist. Summit No. 25114, 2010-Ohio-6126, ¶ 28.

**{¶30}** The jury was also presented with the State's exhibits, which were recordings of the Facebook conversations between Mr. Jones and L.J. in various formats.[2] Mr. Jones asked L.J. what she told Mother, and L.J. responded, "i was like he did mii * * * well raped cuz i aint want it to sound like u did it on purpose[.]" Mr. Jones responded with "delete every[th]ing i sent you[,]" saying that he "aint gettin in tro[u]ble" and that he could "do[] 50 years in prison" for rape. However, at various points in their conversation, he praised her for her skill at fellatio, asked if she would have sexual intercourse with him again, and directed her to touch herself while thinking about him. L.J. told Mr. Jones that "even tho its weird bein around u i st[i]ll feel like i should [protect you,]" and Mr. Jones responded, "thank you for protecting me[.]"

---

[2] State's Exhibit 1 consisted of screenshots taken of some of the Facebook messages by Mother, and State's Exhibit 1a contained those messages on a CD. State's Exhibits 2 through 2e were Detective Young's printed spreadsheet of the messages between Mr. Jones and L.J. that he found on Mother's computer. State's Exhibit 3 contained Detective Young's spreadsheet on a CD.

{¶31} Based on these Facebook messages, the jury could reasonably have found that Mr. Jones engaged in sexual conduct with L.J. The messages explain the events that took place and contain Mr. Jones's admission that he and L.J. engaged in sexual intercourse and fellatio. L.J. appeared to have conflicting feelings about Mr. Jones, stating that she would perform fellatio on him again but also acknowledging that "its weird t[a]lkin to u[.]" However, Mr. Jones's instructions to L.J. to delete the messages between them indicate that Mr. Jones knew that sexual conduct with L.J. was not consensual due to her age.

{¶32} Mr. Jones also argues that the State did not present medical testimony about possible damage to L.J.'s hymen. However, he has not explained how the absence of such testimony should cause this Court to conclude that the jury lost its way given the evidence that was admitted at trial. *See* App.R. 16(A)(7).

{¶33} Upon thorough review of all of the evidence in this case, we cannot conclude that Mr. Jones's convictions for rape and importuning are against the manifest weight of the evidence. Mr. Jones's third assignment of error is overruled.

ASSIGNMENT OF ERROR I

THE TRIAL COURT DEPRIVED APPELLANT OF HIS RIGHT TO PRESENT A DEFENSE IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE ONE, SECTION 10 OF THE OHIO STATE CONSTITUTION.

{¶34} In Mr. Jones's first assignment of error, he argues that the court did not allow him to present a defense because a witness that Mr. Jones believed would have helped his case did not testify. We disagree.

{¶35} Mother's gynecologist, Dr. Ramiz Masri, examined L.J. in August 2010. Mr. Jones sought to call Dr. Masri to testify. The court stated at various points during the trial that: (1) Dr. Masri's testimony would be barred by the rape shield statute; (2) Dr. Masri's testimony

would have been more prejudicial than probative under Evid.R. 403: (3) Dr. Masri's testimony would not have been proper evidence with which to impeach L.J. under Evid.R. 607; (4) Dr. Masri's testimony would have confused the jury as to the legal definition of penetration, and (5) Dr. Masri's report did not list an opinion or qualifications as required by Crim.R. 16(K). Nevertheless, the court told Mr. Jones that he could bring Dr. Masri to court so that the court could question Dr. Masri through voir dire. However, Mr. Jones never presented Dr. Masri to the court for voir dire, and Mr. Jones never requested a continuance to obtain Dr. Masri's presence for voir dire. As a result, the court never definitively ruled on whether Dr. Masri could testify. Thus, contrary to the argument in Mr. Jones's merit brief, the trial court did not ultimately prevent Mr. Jones from calling Dr. Masri as a witness and, therefore, Mr. Jones' argument that the trial court prevented him from presenting a defense is without merit.

{¶36} Accordingly, Mr. Jones's first assignment of error is overruled.

ASSIGNMENT OF ERROR II

APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE ONE, SECTION 10 OF THE OHIO STATE CONSTITUTION.

{¶37} In his second assignment of error, Mr. Jones argues that he had ineffective assistance of counsel at trial. We disagree.

{¶38} In order to prevail on an ineffective assistance of counsel claim, a defendant "must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different." *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 62, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 694 (1984).

{¶39} Mr. Jones argues that his counsel's performance was deficient because counsel failed to subpoena Dr. Masri to testify, did not request a continuance to bring Dr. Masri to court, and did not ensure that Dr. Masri's report complied with Crim.R. 16(K).[3] However, even assuming that counsel's performance was deficient, Mr. Jones does not develop any argument as to how he was prejudiced by counsel's actions. *See Mundt* at ¶ 62; App.R. 16(A)(7).

{¶40} Furthermore, the record is silent as to the substance of Dr. Masri's potential testimony with the only possible evidence being his report.[4] However, assuming Dr. Masri had testified consistent with the contents of his report, his testimony would have been that L.J. likely had had sexual intercourse and that her hymen was "a little loose[.]" Assuming under certain circumstances the distinction between a loose hymen versus a torn hymen could be of critical evidentiary significance, we reiterate that Mr. Jones has not explained how the distinction in this case would have affected the outcome of the trial given all of the evidence, including Dr. Masri's indication in his report that he believed it likely that L.J. had engaged in sexual intercourse. Accordingly, assuming that Dr. Masri would have testified precisely as he had written in his report, Mr. Jones has not explained how he was prejudiced by his counsel's failure to have Dr. Masri testify.[5]

{¶41} Mr. Jones's second assignment of error is overruled.

---

[3] Although Mr. Jones's brief refers to the relevant provision as Evid.R. 16(K), it is clear he is referring to Crim.R. 16(K).

[4] Although Dr. Masri's report was discussed during the trial, it was not proffered or admitted as an exhibit. However, the trial court permitted it to be admitted as an exhibit at the hearing on Mr. Jones' motion for a new trial and, thus, it is part of the appellate record.

[5] To the extent Mr. Jones believes Dr. Masri's testimony would have differed from his report, that is outside the scope of the record on appeal, making postconviction relief the more appropriate avenue to raise those arguments. *See State v. Sheppard*, 9th Dist. Medina No. 10CA0041-M, 2011-Ohio-3516, ¶ 8.

III.

{¶42} In light of the foregoing, the judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

EVE V. BELFANCE
FOR THE COURT

MOORE, J.
CONCURS.

CARR, J.
CONCURS IN JUDGMENT ONLY.

APPEARANCES:

PAUL GRIFFIN, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and NATASHA RUIZ GUERRIERI, Assistant Prosecuting Attorney, for Appellee.