[Cite as *State v. Dixon*, 2014-Ohio-4235.]

COURT OF APPEALS
MUSKINGUM COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | Case No. CT2013-0055 |
| | : | |
| LAFONSE DARNEY DIXON | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:     Appeal from the Muskingum County
                             Court of Common Pleas, Case No.
                             CR2012-0193


JUDGMENT:                    AFFIRMED


DATE OF JUDGMENT ENTRY:      September 18, 2014


APPEARANCES:

For Plaintiff-Appellee:                 For Defendant-Appellant:

D. MICHAEL HADDOX                       ERIC J. ALLEN
MUSKINGUM CO. PROSECUTOR                713 South Front
RON WELCH                               Columbus, OH 43206
27 North 5th Street
Zanesville, OH 43701

*Delaney, J.*

{¶1}   Appellant Lafonse Darney Dixon appeals from the November 13, 2013 judgment entry of the Muskingum County Court of Common Pleas convicting him upon one count each of aggravated murder, kidnapping, and aggravated arson.  Appellee is the state of Ohio.

## FACTS AND PROCEDURAL HISTORY

*Mark Bretz Stops to Help*

{¶2}   This case arose around 8:00 a.m. on August 26, 2012, when Mark Bretz was returning home from an errand at Shirer's Meat Locker in Muskingum County, Ohio.  Bretz's route took him back along State Route 208 near the intersection of Steel Hill Road.

{¶3}   Bretz proceeded over a hill and observed something in the middle of the roadway that was not there when he first passed through.  At first, Bretz believed it was a deer.  As he slowed, the figure rose from the roadway and approached his truck. Bretz realized this was a human being.  He would later describe the individual as "scorched" and badly beaten, completely naked, with skin hanging from her bones.  The figure threw herself on the front of Bretz's truck, screaming "Help me; they're trying to kill me."

{¶4}   Bretz immediately called 911 and opened his truck door to assist the woman.  He looked for anyone who might be in pursuit but saw no one.  Bretz scooped the woman up and carried her to the side of the road, laying her in the grass.  He gave her Gatorade to drink and held her hand, telling her help was on the way.  The woman was able to speak indistinctly despite her terrible injuries.  Bretz observed a tow strap

around her neck and loosened it.  He asked her what her name was, and she said "Celeste."

{¶5}   Investigators would later determine Celeste Fronsman traveled a third of a mile from the spot where she was choked, beaten, soaked with gasoline, and set on fire.  Part of her journey took her through dense brush but somehow she made it to the center of State Route 208 to seek help and encountered Bretz.

{¶6}   Bretz asked Celeste where she was from, and she said "Canton."  He asked who did this to her, and she responded "Katrina Culberson," "'Fonse' Dixon," and "Washington."  Bretz wrote Culberson's name on a piece of paper and gave it to law enforcement when they arrived.

{¶7}   Celeste was transported to the Wexner Medical Center at the Ohio State University and treated in the burn unit.  Dr. Larry Jones testified Celeste had third- and fourth-degree burns covering 70 percent of her body; in 31 years of treating burn injuries, these were among the worst Jones had seen.  He knew upon his initial examination her injuries would prove fatal.  Doctors were able to resuscitate Celeste until family members could arrive, but further treatment would not be successful.  Celeste was ultimately removed from a ventilator and succumbed to her injuries.  The cause of death was determined to be complications of partial and full-thickness burns to 70 percent of her total body area.

{¶8}   In the immediate aftermath of Bretz's discovery in Muskingum County, detectives were on their way to Canton, Ohio, to find the people who killed Celeste.

*The Investigation Leads to Canton*

{¶9}  Katrina Culberson, known on the street as "K.C.," is a prostitute and drug addict who frequents an area known as the "Newton Zone" in Canton, Ohio.   The Newton Zone is known to police for prostitution, drug use, and drug sales.  At the time of the murder of Celeste Fronsman, Culberson was addicted to heroin and crack cocaine.  Culberson was also known to "control" other prostitutes in the sense that she set them up with "dates" using a website called Back Page.  Culberson sometimes did "dates" with these prostitutes and took a portion of the money they earned.  She was known to control prostitutes through violence and intimidation.  Another prostitute testified she observed Culberson's prostitutes with black eyes and evidence of beatings.

{¶10} One of the prostitutes Culberson controlled was Celeste Fronsman. Culberson was also Celeste's lover until August 2012.  Their relationship was known to be fraught with violence; Culberson had beaten Celeste and threatened her in the past. Culberson also encouraged Celeste's drug habit with crack cocaine provided by Culberson's boyfriend: appellant, known as "Fonse."

{¶11} Appellant sold crack cocaine and other drugs in his community, although witnesses insisted he did not use crack himself.  Appellant had at least one other girlfriend, the mother of one of his children, with whom he lived, but he otherwise lived and associated with Culberson.  Appellant knew Celeste and was aware of her relationship with Culberson.

{¶12} Culberson's days were spent hanging around various Canton "flop houses" smoking crack and turning tricks.  One of the "flop houses" appellant was known to sell drugs from was located at 502 Gilmore Avenue, Canton.  Approximately

two weeks before Celeste's murder, police raided the Gilmore house. Appellant rode by on a bicycle, saw the raid in progress, and warned Culberson to stay away.

*Culberson and Appellant Decide to Beat and Kill Celeste*

{¶13} Appellant and Culberson came to believe Celeste had snitched to police and was responsible for the Gilmore raid. Culberson testified "Celeste was telling on a couple people." Celeste also owed Culberson money, which was often the source of violence in their relationship.

{¶14} After the Gilmore raid, Culberson and appellant purportedly began to plot beating Celeste and killing her. Culberson told appellant she knew of a secluded place near Zanesville where "no one would find her." Culberson and appellant then embarked upon several weeks of chasing and terrorizing Celeste.

*Culberson and Appellant Stalk Celeste throughout Canton*

{¶15} Shortly after the Gilmore raid, Culberson picked up Celeste and took her to the home of "Old Hooker Alice" where she brought Celeste into the bathroom and screamed at her, accusing her of snitching. Celeste denied it. Culberson and Celeste next went to the home of Ralph Horne, where they were joined by appellant. Culberson briefly left and upon her return appellant told her Celeste "got away," fleeing to a neighbor's house.

{¶16} A neighbor of Ralph Horne testified that on August 12, 2012, a white female he didn't know burst into his home screaming that people were after her and she needed help. The neighbor reluctantly told the woman he would give her a ride and they got into his van. As they left, the woman said "they're over there" and a car started following them. The woman ducked down inside the van; a female in the pursuers' car

looked inside the van and said "she's in there." The neighbor turned onto 15th Street and the pursuers cut him off, forcing him to stop. A black male and a white female got out of the pursuers' car and walked around the front of the neighbor's van. The woman inside was screaming; the neighbor put the van in reverse and took off again with the pursuers behind him, bumping his van. This time, the neighbor drove directly to the police department. Spotting an officer outside, the neighbor told an officer what happened; the officer scolded the woman for involving the neighbor in her drama and told her to get out of the van. The officer told the neighbor to go about his business.

{¶17} The neighbor did not know any of the people involved. He later saw a newspaper article about the murder of Celeste Fronsman near Zanesville. The neighbor recognized Celeste as the woman who burst into his home asking for help and identified appellant as the black male who got out of the pursuers' vehicle.

{¶18} Jimmy Fronsman is Celeste's father. He lives in the upstairs apartment of the residence of Howard Cammon on St. Elmo Street in Canton. Fronsman's St. Elmo address was the last known address for Celeste as well. Cammon knew Celeste, Culberson, and appellant. Sometime during the week before the murder, Culberson, appellant, and another woman named "Megan" came to Cammon's house asking if Celeste was home. Cammon said no and Megan asked to use the bathroom. Cammon was in the kitchen at the time, but came out to discover Culberson and Megan going through his house, opening doors and closets, looking for Celeste. Cammon told them he wasn't lying about Celeste's whereabouts and told them to get out. Culberson threatened Celeste to Cammon, stating she was going to "get" her although he believed the threats were just "talk."

*August 26, 2012*

{¶19} In the early morning hours of August 26, 2012, Culberson went to the home of Bobby Mann to buy crack cocaine. Monica Washington was asleep on a couch at Mann's; Washington is another prostitute and crack cocaine addict known to appellant, Culberson, and Celeste. Culberson kissed Washington on the forehead, waking her, and showed her a bag of crack. She asked Washington if she would drive around with her and smoke the crack. Washington agreed.

{¶20} Culberson drove with Washington in the passenger seat of a tan Chevy Tahoe owned by Ralph Horne, another of Culberson's "boyfriends." At the intersection of Fulton and Tuscarawas in Canton, Washington spotted Celeste driving her father's blue Dodge truck with someone named Kenny Holmes. Washington pointed Celeste out to Culberson, and the pair chased Celeste to the parking lot of the Canton Wal-Mart. Culberson pulled up to Celeste's vehicle and told her she wasn't going to do anything to her; she just wanted to tell Celeste about a $900 "date" they could do together. Culberson got out of the Tahoe and into the Dodge; she told Washington to drive the Tahoe to the nearby McDonald's on Dueber Avenue to meet them.

{¶21} Culberson also told Washington to activate the child locks on the rear doors of the Tahoe. The child locks prevent the rear doors from opening from the inside of the truck.

{¶22} At McDonald's, Culberson told Holmes to "get lost." Celeste parked and locked her father's blue truck and got into the Tahoe with Culberson and Washington. Culberson called appellant on her cell phone and said only that she was "on her way," not wanting to alert Celeste that they were about to pick up appellant.

{¶23} As they traveled with Culberson driving, Culberson told Washington Celeste "f—d [her] man" and Washington began hitting Celeste inside the truck. Culberson gave Washington pepper spray to use but Washington couldn't figure it out. The Tahoe stopped and picked up appellant at the home of Don Fox. When appellant got into the truck, according to Culberson, they "looked at each other" with the understanding it was time to put their plan into action.

*Appellant and Accomplices Take Celeste to "The Circle Place"*

{¶24} Appellant got in the back with Celeste. Culberson was driving and Washington was in the front passenger seat. Appellant began hitting Celeste in the face and head, opening a gash on her face.

{¶25} At first, Culberson planned to drive to West Virginia. She stopped at the home of Tammy Charlton, another prostitute and crack cocaine user, thinking Charlton would give them directions. Charlton wanted free crack, though, which Culberson and appellant were unwilling to provide. Charlton looked into the back of the Tahoe and saw Celeste on the floor, beaten and bloody. She told the group if they wanted to go to West Virginia they could buy a map and to "get the hell out."

{¶26} The group drove around Canton with appellant and Washington beating Celeste inside the Tahoe. Eventually Culberson pulled onto Interstate 77 South and drove toward Zanesville. In the meantime, appellant and Washington bound Celeste's hands with a black belt and a roll of masking tape they found in the truck. Culberson stopped twice for gas, the second time at a Circle K in Dresden, Ohio, where Washington was captured on video putting gas in the Tahoe and buying a cookie.

{¶27} Eventually the Tahoe reached "the circle place" in Muskingum County Culberson knew of. The beating and strangling continued. Appellant said "the circle place" was not secluded enough so they drove to another spot. Appellant, Culberson, and Washington beat Celeste and choked her with a piece of a tow strap around her neck. Finally, appellant told Culberson to get a can of gas from the back of the Tahoe. Culberson poured gasoline over Celeste and appellant gave her a lighter to set Celeste alight.

*The Aftermath and Arrests*

{¶28} Leaving Celeste behind, appellant, Culberson, and Washington snatched up the gas can and some papers that had fallen out of the Tahoe. They drove back to Canton and returned the Tahoe to Ralph Horne. Horne was angry upon their arrival because they made him late for work. Culberson ordered him to go out and clean the truck. When he did so, he observed blood on the back seat. He asked Culberson what she did and Culberson responded "I beat her ass." Horne perfunctorily cleaned up the truck and went to work, dropping appellant at home on the way.

{¶29} Culberson and Washington went to the home of Gerald Stuckey, another "boyfriend," to shower and smoke crack. Culberson collected their bloody clothes and disposed of them in a dumpster.

{¶30} Appellant picked up Culberson and brought her to the home of Teddy Johnson, where she smoked crack for three days. While there, she learned police were looking for her. She was arrested three days after the murder on an outstanding warrant. Appellant and Washington were brought in for questioning as well. Culberson

and Washington gave a number of false statements denying or minimizing their role in the murder.

{¶31} Soon, though, Culberson was the first to broker a plea deal less than a month later, entering pleas of guilty to aggravated murder, kidnapping, and aggravated arson. Appellee recommended a sentence of life without the possibility of parole in exchange for her truthful testimony against appellant. Washington in turn pled to aggravated murder and aggravated arson and was offered life with the possibility of parole after 25 years in exchange for her truthful testimony.

{¶32} Appellee's copious evidence at appellant's trial included the testimony of accomplices Culberson and Washington, plus that of many witnesses they came into contact with them throughout their campaign to terrorize, beat, and eventually kill Celeste Fronsman. Ralph Horne and his neighbor, Tammy Charlton, Don Fox, and Howard Cammon did not witness the murder itself but reluctantly corroborated details of the accomplices' stories of the days leading up to it. Appellee's case was replete with physical evidence, including the black belt, masking tape, and clothing used to bind Celeste. A soil expert testified the ground at the crime scene was positive for gasoline. Horne turned over the gas can. The Tahoe was examined and found to contain blood evidence. The tow strap around Celeste's neck was matched to a piece still inside the truck. DNA analysis established appellant could not be excluded as a depositor of DNA on the roll of masking tape used to bind Celeste's hands. An expert in analysis of cell phone records corroborated the calls placed amongst the accomplices and witnesses and tracked appellant's cell phone calls from Canton, south along Interstate

77, to Cambridge, Ohio and back. Those calls were placed between approximately 2:00 a.m. and 9:30 a.m. on the date of the murder.

{¶33} Finally, Celeste herself provided the strongest evidence against her killers. She told Mark Bretz the people who did this to her were Katrina Culberson, "Fonse" Dixon, and "Washington."

*Indictment and Trial*

{¶34} Appellant was charged by indictment with one count of aggravated murder [Count I] pursuant to R.C.2903.01(A), including two capital specifications pursuant to R.C. 2929.04(A)(7). Appellant was also charged with one count of kidnapping [Count II] pursuant to R.C. 2905.01(A)(3), a felony of the first degree, and one count of aggravated arson [Count III] pursuant to R.C. 2909.02(A)(1), a felony of the first degree.[1]

{¶35} Appellant entered pleas of not guilty and filed a number of pretrial motions, most of which are not relevant to this appeal. Appellant filed a Motion to Suppress Photographs of the victim's body and appellee responded with a memorandum contra.

*Admission of Photographs of Celeste's Injuries*

{¶36} At the final pretrial, the trial court addressed a number of pending issues, including the photos appellee intended to introduce at trial. Appellee pared down the photos from 95 to 14 and reviewed them with defense trial counsel, then the trial court addressed objections.

---

[1] Appellant was also charged by indictment with one count of conspiracy to commit kidnapping pursuant to R.C. 2923.01(A)(1) [Count IV] and one count of conspiracy to commit aggravated murder pursuant to R.C. 2923.01(A)(1) [Count V]. Counts IV and V were dismissed before trial upon appellee's motion.

{¶37} Appellee's photo exhibits 1.1 and 1.2 were taken by a detective of Celeste at the scene as she was treated by medical personnel. The photos depict the victim as she was found by Mark Bretz. Appellant did not object to these exhibits.

{¶38} Appellee's photo exhibits 65 through 71 are autopsy photos intended to be entered during the coroner's testimony. The photos show the extent and severity of the burns over 70 percent of Celeste's body; specific photos show her torso, her neck and face, her waist down, and her back. One autopsy photo depicts a subdural subgaleal hemorrhage on the skull. Another photo shows the victim's tongue with a bite mark resulting from trauma. Appellant objected to introduction of all autopsy photos (exhibits 65 through 71). The trial court sustained appellant's objection to exhibit 67.

{¶39} Appellee's photo exhibits 72 through 76, the "treatment photos," were intended to be introduced during the testimony of Dr. Jones from the O.S.U. burn center to describe the severity of the individual burns to different regions of the body. Appellant did not object to exhibits 72, 74, 75, and 76 but did object to exhibit 73 arguing the treatment photos are duplicative of the autopsy photos and unduly prejudicial. Appellee responded the photos selected were necessary to demonstrate the severity of the burns to establish the elements of aggravated arson[2] pursuant to R.C. 2909.02, to demonstrate the extent of the victim's injuries while she was still alive,

---

[2] Aggravated arson pursuant to R.C. 2909.02(A)(1) states, "No person, by means of fire or explosion, shall knowingly * * * [c]reate a substantial risk of serious physical harm to any person other than the offender."

and to show the treatment she required including escharotomies.[3] The trial court admitted exhibit 73 over objection.

*Juror 64*

{¶40} Juror 64 first came to the parties' attention during voir dire when he stated he was familiar with the basic facts of this case from newspaper reports: the victim was found burnt and later died. He stated nothing he knew led him to any opinion as to appellant's guilt or innocence. He later acknowledged his cousin is a judge presiding over proceedings against one of the accomplices, but he and his cousin met infrequently and the relationship did not affect his ability to be fair. Finally, Juror 64 was asked by defense trial counsel whether he agreed a criminal defendant might have reasons not to testify in his own defense. Juror 64 responded the only reason he could think of was having something to hide. Upon further questioning, Juror 64 stated he would not necessarily think appellant had anything to hide and could "probably" put aside his feelings, although he admitted he was not sure he would be able to adhere to the presumption of innocence afforded appellant.

{¶41} Defense trial counsel challenged Juror 64 for cause in light of the latter comment regarding the presumption of innocence. Appellee objected and the trial court advised it would question him further on these issues. Juror 64 stated he recognized the presumption of innocence but when asked if he could be fair and impartial if appellant decided not to testify, responded that it "depends" upon the questions asked. Juror 64 ultimately concluded, however, he would not hold the decision not to testify

---

[3] An escharotomy is an incision made in the skin during treatment to relieve pressure due to the inelasticity of burned skin and to maintain circulation easing the buildup of fluid from severe burns.

against appellant. Both parties were given the opportunity to question Juror 64 further about these issues and declined to do so.

{¶42} Juror 64 was seated on the jury. During the testimony of the burn surgeon, at sidebar, the trial court told the parties Juror 64 appeared to be sleeping. Defense trial counsel stated Juror 64 was asleep during opening statements and the trial court observed the juror's head was "bobbing." Defense trial counsel also asked the trial court to admonish Juror 64 about speaking to other jurors, alleging during the jury view of the crime scene, Juror 64 was overheard telling another juror "this is where she came out."

{¶43} At this point the trial court excused the jury and questioned Juror 64, who stated he was not falling asleep, just closing his eyes to aid concentration. He stated he heard all of the evidence and the trial court further admonished him not to discuss the case with other jurors. The trial court advised he would keep an eye on Juror 64 and noted the bailiff saw nothing untoward during the jury view. Defense trial counsel stated appellant had no objection to the trial court's handling of Juror 64.

{¶44} Finally, during the testimony of accomplice Katrina Culberson the next day, the trial court again cleared the courtroom and advised the parties Juror 64 would be dismissed because the trial court observed him sleeping for eight minutes. The parties concurred and raised no objections. Juror 64 was brought into the courtroom, dismissed, and alternate juror number 65 was seated in his place.

*Conviction and Sentence*

{¶45} Appellant was found guilty as charged and the case proceeded to the sentencing phase. Appellant presented a number of witnesses in mitigation. The jury

spared appellant's life and recommended a term of life imprisonment without the possibility of parole.  The trial court found Counts I and III (aggravated murder and aggravated arson) merged for sentencing purposes and followed the jury's recommendation, sentencing appellant to a term of life imprisonment without the possibility of parole plus 11 years on Count II, kidnapping.

{¶46} Appellant now appeals from the judgment entry of conviction and sentence.

{¶47} Appellant raises five assignments of error:

**ASSIGNMENTS OF ERROR**

{¶48} "I. THE TRIAL COURT FAILED TO RECORD THE SEATING OF THE ENTIRE JURY PANEL IN VIOLATION OF STATE AND FEDERAL STATUTORY AND CONSTITUTIONAL GUARANTEES.  THIS IS IN VIOLATION OF APPELLANT'S FIFTH AMENDMENT RIGHT TO DUE PROCESS MADE APPLICABLE TO THE STATES BY THE FOURTEENTH AMENDMENT."

{¶49} "II. APPELLANT WAS DENIED THREE PEREMPTORY CHALLENGES AS GUARANTEED BY OHIO RULE 24(G)."

{¶50} "III. APPELLANT WAS PREJUDICED BY JUROR SIXTY FOUR WHO WAS SPEAKING ABOUT THE CASE WITH FELLOR JURORS DURING THE JURY VIEW.  THIS VIOLATES APPELLANT'S RIGHT TO A FAIR AND IMPARTIAL JURY AS GUARANTEED BY THE SIXTH AMENDMENT TO THE FEDERAL CONSTITUTION AND MADE APPLICABLE TO THE STATES BY THE FOURTEENTH AMENDMENT."

{¶51} "IV. THE TRIAL COURT ERRED IN PERMITTING THE JURY TO VIEW PICTURES OF THE AUTOPSY FOLLOWING OBJECTION BY DEFENSE COUNSEL.

THE USE OF THESE PHOTOS AT TRIAL ALSO VIOLATES THE APPELLANT'S RIGHT TO DUE PROCESS AS GUARANTEED BY THE FIFTH AMENDMENT MADE APPLICABLE TO THE STATE'S (*sic*) BY THE FOURTEENTH AMENDMENT TO THE FEDERAL CONSTITUTION."

{¶52} "V. APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE FEDERAL CONSTITUTION MADE APPLICABLE TO THE STATES BY THE FOURTEENTH AMENDMENT."

**ANALYSIS**

I.

{¶53} In his first assignment of error, appellant argues his convictions must be reversed because the trial court did not record the names of all twelve jurors empanelled. We disagree.

{¶54} First, we note appellant was provided with juror questionnaires identifying jurors by name and number, and the empaneled jurors' individual names are available on the verdict forms they signed. The jurors' identities are therefore in the record. It is not evident, and appellant does not explain, how appellant was prejudiced when alternate jurors selected were not specifically named as they were seated as alternates.

{¶55} Second, we note defense trial counsel did not object to the trial court's method of seating alternate jurors and we therefore review this matter for plain error. Pursuant to Crim.R. 52(B), "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." The rule places several limitations on a reviewing court's determination to correct an error despite the

absence of timely objection at trial: (1) "there must be an error, i.e., a deviation from a legal rule," (2) "the error must be plain," that is, an error that constitutes "an 'obvious' defect in the trial proceedings," and (3) the error must have affected "substantial rights" such that "the trial court's error must have affected the outcome of the trial." *State v. Dunn*, 5th Dist. No. 2008-CA-00137, 2009-Ohio-1688, ¶ 89, citing *State v. Morales*, 10 Dist. Nos. 03-AP-318, 03-AP-319, 2004-Ohio-3391, ¶ 19 (citation omitted). The decision to correct a plain error is discretionary and should be made "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Barnes*, supra, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶56} Appellant equates this case with *State v. Clinkscale*, 122 Ohio St.3d 351, 2009-Ohio-2746, 911 N.E.2d 862, ¶ 15, in which the Ohio Supreme Court reversed convictions because the trial court failed to record the out-of-court dismissal of a deliberating juror and found recording proceedings related to dismissal and replacement of a deliberating juror is of critical importance to protecting a defendant's constitutional rights, especially in capital cases. But, the Court compared those circumstances to the failure to record "relatively unimportant portions of a trial," particularly when the defendant failed to demonstrate that (1) a request was made at trial that the proceedings be recorded or objections were made to the failures to record, (2) an effort was made on appeal to comply with App.R. 9 and to reconstruct what occurred or to establish its importance, and (3) material prejudice resulted from the failure to record the proceedings at issue. Id. at ¶ 13-15, citing *State v. Palmer*, 80 Ohio St.3d 543, 554, 687 N.E.2d 68 (1997).

{¶57} We find the instant case has more in common with *State v. Palmer*, supra, than with *Clinkscale*, as observed by the Court, because recording the alternate jurors' names was not requested, no effort has been made to establish the importance of this omission, and appellant has not demonstrated material prejudice resulting therefrom. Id. Furthermore, when the name of an alternate juror became significant, i.e. when Juror 64 was replaced by Juror 65, the replacement juror's name was known to the parties as she was seated in the jury box and is in the record. Finally, as appellee points out with reference to *State v. Hill*, seating an anonymous jury does not necessarily implicate a fundamental right such that the outcome of the trial must be questioned as a result. 92 Ohio St.3d 191, 200, 2001-Ohio-141, 749 N.E.2d 274.

{¶58} We find any omission in the record of the trial court's seating of alternate jurors does not rise to the level of plain error. Appellant's first assignment of error is overruled.

II.

{¶59} In his second assignment of error, appellant argues the trial court erred in failing to permit him to exercise three peremptory challenges as to alternate jurors. We disagree.

{¶60} Pursuant to Crim.R. 24(G)(2), each party is entitled to three peremptory challenges when five or six alternative jurors are to be impaneled. In the instant case, six alternate jurors were impaneled but the trial court permitted only two peremptory challenges. Neither party objected.

{¶61} Again, we review this matter for plain error as described supra. Pursuant to Crim.R. 52(B), "plain errors or defects affecting substantial rights may be noticed

although they were not brought to the attention of the court." Absent the three requirements for plain error, we will affirm the judgment of the trial court: (1) "there must be an error, i.e., a deviation from a legal rule," (2) "the error must be plain," that is, an error that constitutes "an 'obvious' defect in the trial proceedings," and (3) the error must have affected "substantial rights" such that "the trial court's error must have affected the outcome of the trial." *State v. Dunn*, supra, 2009-Ohio-1688 at ¶ 89.

{¶62} The record indicates the trial court stated each party could exercise two peremptory challenges to the six alternate jurors who were impaneled. This statement is clearly a deviation from the Rule; each party was entitled to three peremptory challenges of the six prospective alternates. We find, though, this matter does not constitute plain error because this deviation from the Rule did not affect appellant's substantial rights such that it affected the outcome of the trial. Appellant points to no evidence in the record that, given the option of exercising one additional peremptory challenge to the alternates, the outcome of this trial would have been different.

{¶63}  While the trial court was in error in not permitting the required number of peremptory challenges, we do not find this error affected appellant's substantial rights. Appellant has thus failed to demonstrate plain error and his second assignment of error is overruled.

III.

{¶64} In his third assignment of error, appellant argues his right to a fair and impartial jury was violated by the presence of Juror 64 on the panel before that juror was removed. We disagree.

{¶65} Crim.R. 24(B)(9) permits the court to refuse to disqualify a juror due to a preconceived opinion as to guilt or innocence if, after examination, the court believes the juror will render an impartial verdict. *State v. Iden*, 5th Dist. Licking No. 96-CA-88, unreported, 1996 WL 753206 (Dec. 12, 1996) at *3, citing *State v. Grubb*, 44 Ohio App.3d 94, 95, 541 N.E.2d 476 (1988). We review the trial court's decision for an abuse of discretion. Id.  We have followed the holding of the Twelfth District Court of Appeals in *City of London v. Scurry*, wherein the Court stated:

> A party challenging a jury panel has the burden of showing that the jurors were either unlawfully empanelled or that the jurors cannot be fair and impartial. [ ]. Mere speculation as to bias among the pool of prospective jurors will not justify quashing the entire venire. [ ]. This court will not reverse a trial court's decision not to dismiss an entire jury panel absent an abuse of discretion. [ ]. (internal citations omitted).
>
> *State v. Feagin*, 5th Dist. Richland No. 05 CA 1, 2006-Ohio-676, at ¶ 23, appeal not allowed, 111 Ohio St.3d 1417, 2006-Ohio-5083, 854 N.E.2d 1094, citing *City of London v. Scurry*, 12th Dist. Madison No. CA95-10-033, unreported, 1996 WL 406263 (July 22, 1996).

{¶66} Appellant argues Juror 64 poisoned the jury panel prior to his removal for three reasons: he demonstrated an inability to be fair and impartial, he is the cousin of the judge presiding over an accomplice's trial, and he allegedly spoke to other jurors during the jury view.  We disagree with appellant's characterizations of Juror 64's

responses to questions by the trial court. While he first indicated an inability to honor the presumption of innocence, upon further inquiry he stated he stated he could be fair and impartial and would not penalize appellant if he didn't testify. He further stated he rarely sees his cousin and has not discussed the case with him, and there is no evidence Juror 64 actually spoke to another juror during the jury view. Juror 64 was eventually removed for other reasons (sleeping) and the record contains no evidence he tainted the jury.

{¶67} Under these circumstances, we are unable to say the trial court's decision not to disqualify Juror 64 was unreasonable, arbitrary, or unconscionable. Appellant's third assignment of error is overruled.

IV.

{¶68} In his fourth assignment of error, appellant argues the trial court should not have permitted the jury to view the autopsy photos. We disagree.

{¶69} The admission or exclusion of evidence is a matter left to the sound discretion of the trial court. Absent an abuse of discretion resulting in material prejudice to the defendant, a reviewing court should be reluctant to interfere with a trial court's decision in this regard. *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967). In *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768 (1984), paragraph seven of the syllabus, the Supreme Court of Ohio held:

> Properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material

prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number.

{¶70} Evid.R. 104 places the trial court in the position of determining admissibility of evidence. Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 402 states:

All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio. Evidence which is not relevant is not admissible.

{¶71} Further consideration is required under Evid.R. 403(A): "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶72} Appellant contends the trial court abused its discretion in permitting the autopsy photos to be shown over objection because the photos are duplicative of the treatment photos and serve no legitimate purpose beyond shocking the jury.

{¶73} The photos at issue in this case are unquestionably grisly. Nevertheless, "provided the probative value of each photograph in the case at bar outweighs its prejudicial impact and the photograph is neither repetitive nor cumulative in nature, its admission as evidence will not be disturbed as an abuse of discretion by the trial court."

*State v. Morales*, 32 Ohio St.3d 252, 258, 513 N.E.2d 267 (1987). The trial court reviewed each photograph carefully and admitted only those found not to be unnecessarily duplicative. We have reviewed each of the admitted photos and agree they are not repetitive or cumulative in nature. The probative nature of these photographs substantially outweighs their prejudicial value because the photos capture the victim and the injuries she suffered at three different points: upon her discovery by Bretz, during her resuscitation and treatment while still living, and postmortem. The autopsy photos, we regret to note, best illustrate the extent and severity of the victim's injuries. The trial court did not abuse its discretion in admitting the limited number of photos.

{¶74} We find the admission of the photographs in this case was relevant and not unduly prejudicial. See, *State v. Woods*, 5th Dist. Stark No. 2013CA00176, 2014-Ohio-2375; *State v. Patterson*, 5th Dist. Stark No. 2012CA00098, 2013-Ohio-1647.

{¶75} Appellant's fourth assignment of error is overruled.

V.

{¶76} In his fifth assignment of error, appellant argues he received ineffective assistance of counsel. We disagree.

{¶77} To succeed on a claim of ineffectiveness, a defendant must satisfy a two-prong test. Initially, a defendant must show that trial counsel acted incompetently. *See*, *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). In assessing such claims, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might

be considered sound trial strategy.'" *Id.* at 689, citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158 (1955).

{¶78} "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689. The question is whether counsel acted "outside the wide range of professionally competent assistance." *Id.* at 690.

{¶79} Even if a defendant shows that counsel was incompetent, the defendant must then satisfy the second prong of the *Strickland* test. Under this "actual prejudice" prong, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.

{¶80} Appellant cites a number of instances of alleged ineffective assistance of defense trial counsel and we will examine each in turn.

{¶81} First, appellant argues counsel was ineffective in failing to strike Juror 64. When a defendant bases an ineffective-assistance claim on an assertion that his counsel allowed the impanelment of a biased juror, the defendant "*must* show that the juror was *actually biased* against him." (Emphasis in original.) *State v. Mundt*,115 Ohio St.3d 22, 31, 2007-Ohio-4836, 873 N.E.2d 828 (2007) citing *Miller v. Francis,* 269 F.3d 609, 616 (C.A.6, 2001). (internal citations omitted).

{¶82} As we discussed supra in our discussion of appellant's third assignment of error, the record does not establish Juror 64 was biased. Upon further inquiry by the trial court, he indicated his ability to be impartial. Appellant has not demonstrated actual bias. Further, counsel's decision to challenge or exclude a juror is usually ascribed to

trial strategy. *Mundt*, supra, 2007-Ohio-4836 at ¶ 64. Decisions which constitute trial strategy do not generally rise to the level of ineffective assistance of counsel. A reviewing court must adopt a deferential attitude to the strategic and tactical choices counsel made as part of a trial strategy. *State v. Griffie,* 74 Ohio St.3d 332, 333, 658 N.E.2d 764 (1996). "Few decisions at trial are as subjective or prone to individual attorney strategy as juror *voir dire,* where decisions are often made on the basis of intangible factors." *Miller v. Francis,* supra, 269 F.3d at 620.

{¶83} In this case, we conclude the seating of Juror 64 does not rise to the level of ineffective assistance of counsel.

{¶84} Appellant further argues trial counsel was ineffective in "failing to make proper objections" throughout the trial. We note appellant cites no specific instance where counsel should have objected and failed to do so, instead arguing generally counsel made very few objections throughout the trial. Mere failure to object is not enough to sustain a claim of ineffective assistance of counsel. *State v. Crawford*, 5th Dist. No. 07 CA 116, 2008–Ohio–6260, ¶ 72, appeal not allowed, 123 Ohio St.3d 1474, 2009–Ohio–5704, 915 N.E .2d 1255, citing *State v. Fears*, 86 Ohio St.3d 329, 347, 715 N.E.2d 136 (1999). We respect the fact this was a capital case and counsel had reason to be cognizant of the impression made upon the jury by frequent objections, above and beyond the general considerations attributed to trial strategy.

{¶85} Appellant next argues counsel was ineffective in opening the door to certain testimony by appellee's expert which increased the statistical probability DNA evidence found in the case belonged to him. Defense trial counsel asked the DNA expert about statistical probabilities within the smaller pool of the African-American

population, resulting in a higher statistical probability the DNA belonged to appellant. The resulting effect on statistical probabilities was then exhaustively explained by both parties. In the context of the entire trial, we find defense trial counsel was not deficient in this line of questioning despite any unintended result. See, *State v. Boyd*, 5th Dist. Richland No. 12CA23, 2013-Ohio-1333. Trial strategy and even debatable trial tactics do not establish ineffective assistance of counsel. *State v. Conway,* 109 Ohio St.3d 412, 2006–Ohio–2815, ¶ 101.

{¶86} Finally, appellant argues counsel was ineffective in making only a "general" Crim.R. 29 motion. Appellant faults counsel for failing to set forth "specific grounds" for his acquittal and then fails to reveal what those specific grounds should have been. Our review of the substantial record in this case reveals defense trial counsel acted thoughtfully and deliberately in reserving the right to make a Crim.R. 29 argument and then doing so. The purpose of a motion for acquittal pursuant to Crim.R. 29(A) is to test the sufficiency of appellee's evidence and if the evidence is insufficient, to take the case from the jury. Appellant fails to point out any argument that could have been raised as to the sufficiency of the evidence, much less how such argument would have resulted in his acquittal, and we therefore decline to find trial counsel ineffective for not being more specific.

{¶87} Appellant's fifth assignment of error is overruled.

## CONCLUSION

{¶88} Appellant's five assignments of error are overruled and the judgment of the Muskingum County Court of Common Pleas is affirmed.

By: Delaney, J. and

Hoffman, P.J.

Baldwin, J., concur.